Carol Bavousett Mattick
Texas Bar No. 01933050
CAROL BAVOUSETT MATTICK, PLLC
110 Broadway St., Ste 690
San Antonio, TX 78205
(T): 210-272-1860
(F): 512-532-6554
Email: carol@cbmattick.com
Appearing Pro Se or Pro Hac Vice

**FILED**

JUN 17 2019

CLERK
U.S. BANKRUPTCY COURT
BY_____
DEPUTY CLERK

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ALASKA

In re:                                    )
                                          )
Pomrenke Mining, LLC                      )   Case No 19-00083 GS
                                          )   Chapter 7
    Debtor                                )

### CAROL BAVOUSETT MATTICK, PLLC'S RESPONSE TO TRUSTEE'S MOTION FOR APPROVAL TO SELL ASSETS, FREE AND CLEAR OF LIENS, TO NWG/POMRENKES

Creditor **CAROL BAVOUSETT MATTICK, PLLC**, representing itself pro se and pro hac vice pursuant to AK LBR 9010-2(b)(1), has filed this response to the Trustee's first Motion to Sell Assets at Public Auction, Free and Clear of Liens and his second Motion for Approval to Sell Assets, Free and Clear of Liens, to NWG/Pomrenkes.

Bankruptcy is a process that emphasizes equity. There are equities for Northwest Gold Diggers, LLC, "NWG") the minority equity holder in the Debtor, and its own equity holders Steve and Shawn Pomrenke. NWG contributed fixed assets which the Debtor put on its initial balance sheet at $2,114,000, based on figures provided by NWG. (See Pomrenke Mining's initial detailed balance sheet dated 12/31/16, Exhibit "A"[1]). There were no appraisals. The equity holders of the Debtor simply took in good faith the values provided by other equity holders of the assets they contributed. In addition, over the course of the Debtor's operations, NWG contributed cash of approximately $454,309[2]. But there are also equities in favor of Blue Water Gold, LLC and Blue Water Mining, LLC, the remaining equity holders of the Debtor - primarily due to their own equity

---

[1] Northwest Gold Diggers, LLC contributed four assets: The Christine Rose, The Tuvli I, The Tuvli II and the Golden Girl, all vessels, all fixed assets. The aggregate value for those assets on this balance sheet is $2,114,000.
[2] According to the Trustee's Motion for Approval to Sell to NWG/Pomrenkes, Pg 4, Docket # 50

RESPONSE TO TRUSTEE'S FIRST AND SECOND MOTIONS TO SELL ASSETS OF THE DEBTOR.
*In Re Pomrenke Mining, LLC, a Delaware Limited Liability Company: Case No. 19~00083*

Page 1 of 12

holders who invested approximately $5 million and have seen no distributions. They bought leases of underwater land off Nome, AK for $220,000. (See the stock purchase agreement for equity stock in Blue Water Gold Alaska, Inc. Exhibit "B") and those leases were made available exclusively to the Debtor. BWG and BWM also contributed fixed assets to the Debtor initially valued at $2,295,965[3]. (See Exhibit "A"). *Those Blue Water equity holders are in exactly the same position as Steve and Shawn Pomrenke in relation to this bankruptcy process.* It is for this reason that I believe this bankruptcy process should: 1) be focused on absolutely maximizing the value obtained from the sale of the Debtor's assets so that the maximum surplus funds may be distributed to equity holders, after payment of administrative expenses and creditors' claims; and 2) distribute those surplus funds through equity distributions rather than allowance of large insider claims or insider offers to purchase the assets.

I hope to persuade the court this is the right course of action especially because the insider offer from NWG and the Pomrenkes assigns values to specific assets that are significantly lower than a number of indications of current market value I have been able to obtain. Consequently, I oppose the Trustee's Motion for Approval to Sell to NWG/Pomrenkes and support the Trustee's Motion to Sell by Auction. I also support the Trustee's Motion to Sell by Auction because I believe it will <u>fully</u> repay all non-insider claims and pay them in a more timely manner with less risk than the proposed sale to Northwest Gold Diggers and the Pomrenkes.

*1. The Pomrenkes and their Entity Northwest Gold Diggers, LLC Are "Insiders"*

Section 101(31) of the Bankruptcy Code (11 U.S.C. 101(31)) sets forth a number of roles in relation to the Debtor that are considered "statutory insiders". They include directors (or Managers of LLCs) and officers, categories in which both Steve and Shawn Pomrenke served almost until the Debtor's petition was filed. However, I believe they also qualify as what are called "non-statutory insiders" in the bankruptcy case law. Because all of the assets are located in Alaska and

---

[3] The remaining assets on the balance sheet were contributed by Blue Water Gold, LLC and Blue Water Mining, LLC which consisted primarily of fixed assets but also organizational cost. The reductions in total assets attributed to depreciation and amortization were backed out of this number since they do not represent a cash payment or value of assets.

RESPONSE TO TRUSTEE'S FIRST AND SECOND MOTIONS TO SELL ASSETS OF THE DEBTOR.
*In Re Pomrenke .Mining, LLC, a Delaware Limited Liability Company: Case No. 19-00083*

the operating business was conducted in Alaska while the back-office operations were conducted in Texas, Steve and Shawn Pomrenke currently have and have had a disproportionate amount of control within the business. I cite three examples:

a. The Debtor's assets have always been located either: 1) in the Port of Nome to which the Pomrenkes have had access as representatives of the Debtor; or 2) on land owned by the Pomrenkes. As such, the assets of the Debtor have been and continue to be under the care and control of the Pomrenkes. I fear that gives them the opportunity to misuse and/or diminish the value of the Debtor's assets.

Despite my request that the he seek an order from the court to turn over the assets of the Debtor located on the Pomrenkes' land, the Trustee has refused to do so. See Creditor's Letter to Trustee's Counsel dated 04/22/19, Exhibit "C"). In conversation, the Trustee and his counsel have cited the Pomrenkes' "continuing co-operation" and have not addressed the opportunity for diminishment of the value of the Debtor's assets.

b. Since the asset purchase transaction, Shawn Pomrenke has controlled access to the Connex containers which were used under his direction to separate gold from debris mined on the Debtor's vessels. Whether all gold mined was accounted for was entirely in his control.

c. On June 11, 2019, the Trustee's counsel forwarded an inquiry from NWG's counsel about damage to the Tuvli II which evidently occurred during the 2017 mining season when it was leased by the Debtor to Current River Electric and which damage was recently reported to the Trustee by Shawn Pomrenke. (See Exhibit "D") The Debtor did have a written lease agreement with the lessee and required the lessee to obtain insurance. However, according to the Debtor's controller, damage was not reported to the Debtor's back office operations. The only personnel of the Debtor on site who could have and should have noticed the damage and reported it to back office operations were Shawn and Steve Pomrenke. If the back office operations had been

notified, the Debtor could have held the lessee accountable and required the lessee to make a timely insurance claim. The Trustee's counsel is now concerned that it may be too late to make an insurance claim.

Northwest Gold Diggers, LLC is a closely held company. When I was doing due diligence in connection with the asset purchase transaction which formed Pomrenke Mining, I asked for the corporate records of Northwest Gold Diggers. I was told by Steve and Shawn Pomrenke there were none; that the company was owned 50% by Steve Pomrenke and 50% by Shawn Pomrenke; and that Steve Pomrenke was the sole Manager. The liability shield of that entity should be intact to shield the Pomrenkes from liability, assuming they maintained good records and did not mix their personal expenses with company expenses. However, for the purpose of determining whether it is a "non-statutory insider", Northwest Gold is and should be considered an alter ego of Shawn and Steve Pomrenke because it is solely owned by the two men.

2. *Approval of a Sale to Insiders Requires the Court to Review the Transaction, Review It with Heightened Scrutiny and Determine It is Fair*

If a party in interest in a bankruptcy case is deemed to be an "insider", bankruptcy courts recognize the need to review any transaction between the Debtor and the insider with "heightened scrutiny" or some similar formulation for review. The level of inquiry required for sales to insiders is not spelled out with precision and had been developed on a case-by-case basis, focusing on the nature of the sale process, exposure of the assets to market, openness of the proceedings and fairness of the price paid by the insiders.[4] The cases often compare evidence of the activities of the Debtor and the insider against a set of standards which, if met, would defeat opposition to the insider's offer to purchase the Debtor's assets. In this case, I believe the standards generally applied across many cases have not been met.

In *In Re Tidal Construction Co, Inc.* 446 B.R. 620 (Bankr. S.D. GA, 2009) (*"Tidal"*) provides a good comparison to the instant case because it involves the sale to a new corporation

---

[4] Carragher, "Sales to Insiders: Are They Entirely Fair?", 29 American Bankruptcy Institute Journal 52 (2010)

RESPONSE TO TRUSTEE'S FIRST AND SECOND MOTIONS TO SELL ASSETS OF THE DEBTOR.
*In Re Pomrenke .Mining, LLC, a Delaware Limited Liability Company: Case No. 19-00083*

that the Debtor's insiders had formed. Here, while NWG is not new, the Trustee's proposed sale is to an entity whose equity holders are insiders in relation to the Debtor. *Tidal* is also provides useful analysis because the court performs a review under heightened scrutiny and then allows one sale and not another. The approved sale involved a Debtor real estate developer selling one creditor's collateral to the insider entity but the creditor was making a new secured loan to the insider entity. The court stated:

> "…..even when parties are completely forthright with the facts surrounding the transfer, §363 sales to insiders are subject to a higher scrutiny because of the opportunity for abuse. *In re Mallory Co.,* 214 B.R. 834, 837 (Bankr.E.D.Va.1997). This higher scrutiny requires (1) that the proposed purchase price be "at the very least the lessor [sic] of an acceptable appraised value or the tax assessment value," and (2) that the property must have been offered to the public in some form before the court can approve an insider sale. *Id.* at 838; *In re Gulf Coast Oil Corp.,* 404 B.R. 407, 424 (Bankr.S.D.Tex.2009). In fact, the debtor must show that the assets are being sold for the highest price attainable. *Mallory* at 837. At the very least the court must be satisfied that an insider transaction is the result of bona fide arm's length transactions and not driven by other factors. *See generally In re General Bearing Corp.,* 136 B.R. 361 (Bankr.S.D.N.Y.1992).
>
> Here, I find that the terms of the proposed BankSouth collateral sale are equal to the market value because the properties have been on the market for several months and the listing prices have been lowered to stimulate sales. That the properties continue on the market without selling is indicative of the fact that the properties are worth some amount less than the asking price. Because they have been exposed to the market for an extended period of time without being purchased, I am convinced that the BankSouth collateral is being transferred to Georgia Bay for the highest price reasonably attainable. As such, this sale meets the higher scrutiny due insider sales. The terms of the sale have been fully revealed to creditors at the hearing and examined by the Court. I find this level of disclosure and scrutiny sufficient to meet the heightened standard test."

In contrast, regarding the sale not approved, the Court said the following:

> "The evidence, however, does not reveal that the estate would realize the full value of the Coastal collateral which still retains a small, although marginal equity. For that reason, the Motion relating to its collateral will be denied on an interim basis."

In this case, a sale to NWG/Pomrenkes would not be "offered to the public" while a sale by auctioneer would meet that standard. The Pomrenkes could be allowed to bid in that auction and purchase the property for its market value. Ritchie Bros presented a sales and auction plan in its

RESPONSE TO TRUSTEE'S FIRST AND SECOND MOTIONS TO SELL ASSETS OF THE DEBTOR.
*In Re Pomrenke .Mining, LLC, a Delaware Limited Liability Company: Case No. 19~00083*

affidavit to the Trustee's original Motion to Sell Assets of Estate by Public Auction, DE # 36 which I believe will meet this standard.

While the *Tidal* properties had already been on the market for several months, the assets of Pomrenke Mining have barely been on the market. The Debtor did place ads in the Nome Nugget and other outlets prior to filing its petition for bankruptcy. It did get some indications of interest, which it turned over to Debtor's counsel and the Trustee in mid-April.

When I appeared at the continuation of the §341 creditors' meeting on 05/30/19, the Trustee told me that he had not contacted any of the persons who had indicated an interest in purchasing the Debtor's assets. In the interim, I have been able to contact some of those persons whose affidavits are set forth as Exhibits "E" and "H" to this response.

Mr. Joe Beck is the manager at Lee Shore Boats in Port Angeles, WA who supervised the manufacture of the Ophir, a 30' landing craft owned by the Debtor. In pertinent part, Mr. Beck states that the Ophir should be marketed as a landing craft rather than a gold mining dredge because there are many uses for such a boat; that current demand for such boats far exceeds supply as evidenced by the fact that his employer has a backlog of a year and a half worth of orders; and that he has never seen a boat manufactured by Lee Shore Boats that did not sell for at least its original purchase price in the secondary market. (See Exhibit "E" which will be filed directly by the Affiant). The original purchase price for the Ophir was approximately $189,789 with equipment and trailer. (See Exhibit "F", Report from BWG accounting records). In the offer of NWG/Pomrenkes attached to the Trustee's Motion for Approval to Sell Assets to NWG/Pomrenkes (DE # 50), the Pomrenkes assign a value of $80,000 to the Ophir.

Mr. Joe Burnham is a retired construction pilings contractor who has taken on a second career as a marine gold miner of the shore of Nome, AK. He bid on the Tuvli I and II when Pro-West Contractors, Inc. sold those vessels to NWG just prior to NWG contributing them to the Debtor. We know from records of the Debtor that NWG paid $600,000 for the two vessels. (See the promissory note for the purchase price, Exhibit "G") Mr Burnham recounted to me that he delivered a cashier's check to Pro-West to bid on the vessels but was told he had just missed out.

He would like to bid on the vessels again through a public auction. Based on his experience in the construction industry, he stated that the two vessels would be of interest to a wide variety of potential buyers including coastal freight haulers, oil field boom haulers, and construction businesses like his former business. (See Exhibit "H", to be filed directly by the Affiant) In the offer of NWG/Pomrenkes attached to the Trustee's Motion for Approval to Sell Assets to NWG/Pomrenkes (DE # 50), the Pomrenkes assign a combined value of $250,000 to the Tuvli I and II.

These contacts demonstrate that there are significant questions about whether the sales price offered by NWG/Pomrenkes is a "fair price" or the "highest price attainable" as required by the *Tidal* court. I am continuing to reach out to other persons who have indicated interest in purchasing the Debtor assets and will attempt to obtain affidavits from them as well.

Other bankruptcy courts have dealt with the proper standards for a sale of substantially all assets to insiders[5]. In *In Re Summit Logistics, Inc.* (Bankr D. NJ 2008) 2008 WL 819934, the court recognized that the proponents of the sale to insiders (in this case the Debtor) had the burden of proof and set forth requirements that the sale meet: 1) a sound business justification; 2) fairness of the proposed sale price; and 3) good faith on the part of the insider purchaser. Regarding the first requirement, the court said there must be a sound business justification for a sale outside the normal plan process. In the instant case, the "normal" process is most likely an auction which the Trustee initially proposed to do. Regarding the 2nd requirement, the court noted that the Debtors set up an auction process but several proposed purchasers substantially reduced their initial proposals or withdrew their offers after conducting substantial due diligence and no additional bids were submitted prior to the bidding deadline. While the result allowed the proposed sale to insiders, the standards were significant and have not been met in the instant case.

---

[5] *In Re Family Christian* 533 B.R. 600 (Bankr W.D. MI 2015); *In Re Roussos* 541 B.R. 721(Bankr C.D. CA, 2015) and *In Re Roussos* (Bankr C.D. CA, 2016) 2016 WL 5349717; *In Re W.A. Mallory Company*, 214 B.R. 834 (Bankr, E.D. VA, 1997); *In Re Bidermann Industries U.S.A., Inc.* 203 B.R.547 (Bankr. S.D. NY, 1997);

RESPONSE TO TRUSTEE'S FIRST AND SECOND MOTIONS TO SELL ASSETS OF THE DEBTOR.
*In Re Pomrenke .Mining, LLC, a Delaware Limited Liability Company: Case No. 19~00083*

    *3. Approval of a Sale to Insiders Requires the Court to Determine the Insider Purchaser is Acting in Good Faith.*

Separate and apart from the court's review of sales of Debtor assets to insiders, Section 363(m) of the Bankruptcy Code (11 U.S.C. 363(m)) requires that a purchaser (whether insider or not) purchase the assets from the bankruptcy estate in "good faith". The court in *In Re Summit Logistics, Inc.* cited above stated the requirement for the proponent of an insider sale to prove good faith as doing so under "heightened scrutiny" and showing a fair and open sale process. In the *Summit Logistics* case, the proponents contacted over 70 potential buyers pre- and post-petition. Another factor was whether insiders were insulated from liability and received releases from liability as a part of the sale. The sale process in the instant case has not involved other potential bidders at all.

I have no definitive evidence that Steve and Shawn Pomrenke have been or are currently acting in bad faith and suspect that one or more Rule 2004 examinations will be required to gather evidence. However, if it is determined at a later date that either man did indeed act in bad faith, a decision to sell all of the assets of the Debtor to them or NWG now will have been a big mistake.

Below, I cite several instances of incomplete information which may form the basis for inquiry in a Rule 2004 examination.

a) Sometime after the closing of the asset purchase transaction in the summer of 2016 and by the end of 2016, NWG/Pomrenkes and their accountant Kevin Fimol gave the Debtor's accountant a figure of $1,484,000 for the Christine Rose (See Exhibit "A"). No one has reported damage to the Christine Rose. And yet, in their offer to purchase all of the assets of the Debtor, NWG/Pomrenkes assign a value of $350,000 for the Christine Rose. That is such a big difference, I believe it deserves some questioning.

b) Shawn Pomrenke has filed a proof of claim for a maritime lien based on work he did on the other vessels for $240,000. We know that Dillon Willis put in approximately $127,206 of work on the Tuvli II (See Exhibit "I", Report from accounting records of Pmrenke

Mining), . Presumably both Shawn Pomrenke's and Dillon Willis' work would increase the value of the vessels while the damage to the Tuvli II would decrease its value. NWG/Pomrenkes gave a value of $400,000 for the Tuvli II.in 2016 and now assign it a value of $100,000.

c) On August 24, 2018, a payment of $71,087.50 came in to the Debtor from the Discovery Channel (Wells Fargo bank statement of the Debtor for August 2018, See Exhibit "H") and on the very same day Shawn Pomrenke, a signatory on the account, came in and drew two cashiers checks: one in the amount of $10,010 payable to the order of Cody Moen, the crew chief of the deckhands working for the Debtor, and one in the amount of $52,010 payable to the order of NWG. While there are disputes about whether the amounts contributed by NWG were capital contributions or loans, there were no payment terms set by the Board of Managers of the Debtor or any loan documentation signed by the Debtor that would allow withdrawal from the bank account of the Debtor at will.

d) On October 9, 2018, Cody Moen, the crew chief of the deckhands that were supposed to be working full time for the Debtor, texted the controller of the Debtor with a social media post of a pile of gold with a caption of " Here's a little peek at over 1,000 oz of gold" See (Exhibit "J", Screen capture of social media post) and (Exhibit "K:, the controller's affidavit, which will be filed directly by the Affiant). If that gold were collected on behalf of the Debtor, it did not reach the Debtor's bank account (Copies of the Debtor's Profit and Loss Statements, See Exhibit "L")

4. *The Risk vs the Promise of An Open Auction Process*

The offer made by NWG/Pomrenkes provides that NWG will only pay $400,000 of its $1,036,500 offer price with the balance due under a note for $636,500 bearing interest of 6% per annum for a term of one year. Presumably, NWG/Pomrenkes will earn the net profit necessary to repay the note by operating the vessels and other equipment they want to purchase. I do not believe that Shawn Pomrenke is capable of forecasting with any reliability the amount of gross revenue, gross profit or net profit his marine mining operation will produce.

As set forth in Exhibit "M", the profit and loss statements of the Debtor show the following financial results:

|  | 2016 | 2017 | 2018 |
|---|---|---|---|
| Gross Revenue | $615,281.28 | $1,695,591.14 | $606,583.86 |
|  |  |  |  |
| Gross Profit | $184,352.72 | $219,399.35 | $15,362.25 |
|  |  |  |  |
| Net Profit | <$165,683.11> | <150,082.60> | <$251,590.72> |

Even if one presumes that NWG/Pomrenkes would be frugal with their operating expenses, the gross profit numbers in these historical results reflect the expenses necessary to make the revenue. At no point in the operations of the Debtor, which relied on these assets proposed to be sold in order to generate revenue, did it ever achieve $636,500 plus interest in gross profit. Furthermore, as V.P. for Mining Operations, Shawn Pomrenke was solely responsible for the operation of these assets and creation of revenues from marine mining. Furthermore, Shawn Pomrenke's track record on making reasonable projections is not good. Attached is a unanimous written consent of the Board of Managers signed by Shawn Pomrenke that adopts a set of pro forma cash flow statements as a budget. The projections for revenues provided by Shawn Pomrenke were for $1,644,500 per year. (See the original Exhibit "C" to the Written Consent of the Board of Managers attached to this response as Exhibit "M").

### 5. Conclusion

Regardless whether the courts in "insider sale" cases determine that the proposed sales to insiders are allowable under the circumstances or not, they put forth fairly consistent standards for such sales and require that the proponents prove the standards have been met. In this proposed sale to NWG/Pomrenkes, none of those standards have been met. While the evidence that an auction would yield a higher overall value for the assets is preliminary, that evidence needs to be

pursued and developed in order to create a fair and open sales process. Given the Pomrenkes, and Shawn Pomrenke in particular, have not shown the ability to make sufficient gross profits to pay off their proposed one year note, a sale of substantially all the assets to the Pomrenkes is at least as risky as if not more risky than a sale at auction.

*[signature]*
Carol Bavousett Mattick
On behalf of
Carol Bavousett Mattick, PLLC

RESPONSE TO TRUSTEE'S FIRST AND SECOND MOTIONS TO SELL ASSETS OF THE DEBTOR.
*In Re Pomrenke .Mining, LLC, a Delaware Limited Liability Company: Case No. 19~00083*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 17, 2019, a true and correct copy of Creditor Carol Bavousett Mattick, PLLC's Response to the Motion to Dismiss the Petition of Pomrenke Mining, LLC in Bankruptcy made by Northwest Gold Diggers, LLC was served on:

Cabot C. Christianson, Esq
Michael R. Mills, Esq.
Joan Travostino, Esq.
Michelle L. Boutin, Esq.
U.S. Trustee Kenneth W. Battley

by electronic means.

/s/ Carol Bavousett Mattick
Carol Bavousett Mattick, PLLC