UNITED STATES BANKRUPTCY COURT
DISTRICT OF ALASKA

In Re: )
)
POMRENKE MINING, LLC, a Delaware )
Limited Liability Company, ) **Case No.: 19-00083 GS**
)
                  Debtor. ) Chapter 7
_____ )

**ORDER GRANTING TRUSTEE'S MOTION FOR APPROVAL TO
SELL ASSETS, FREE AND CLEAR OF LIENS, TO NWG/POMRENKE**

The chapter 7 trustee, Kenneth W. Battley (Trustee) has filed competing motions to sell assets of the estate. The debtor engaged in gold mining in Nome, Alaska, and the trustee seeks to sell the following personal property:

- The Christine Rose, a near shore dredge vessel, approx. 80' Long, 20' Beam; including custom built wash plant consisting of a gantry and spud system, a Caterpillar 320L, excavator, winches, customer built anchors, water pump, in/out drives and an enclosed control center;

- The Golden Girl, a 2004 North River aluminum skiff, approx., 20' Long;

- The Tuvli I (a/k/a Tuvli 160), a 1968 welded steel flat deck cargo barge, approx., 157.5 Long, 45' Breadth; 10.3' Depth;

- The Tuvli II, a 1954 M/V Liteweight mechanized landing craft, approx. 65' Long, 21' Beam, 8.3' Depth;

- Raw Materials for a Custom Built Wash Plant for the Tuvil 1, including Screen Deck and other materials;

- The Havilah, a 2012 aluminum dredge Catamaran, approx., 50' Long, 16' Beam, and accompanying trailer: 1986 two-axle welded aluminum trailer, mfg. by Associated Boat Transport; approx. 48';

- The Ophir, a 2012 welded aluminum Swiftsure; approx. 30' Long, and accompanying trailer: 2012 King KTB10500B3 Trailer; approx. 28' Long, 12,504 lbs. carrying weight;

- 2011 EnduraMax RV 30MFW;

- 2011 EnduraMax RV 33MFW;

- 2011 EnduraMax RV 4012END;

- Polaris Ranger Crew 800 – 6 person All Terrain Utility Vehicle with dump bed, gasoline;

- Polaris Sportsman X2 550 – 2 person All Terrain Vehicle;

- Assorted mining and dive equipment, electronic equipment, shop supplies and equipment, office supplies and equipment, kitchen and household goods, all as set forth in Schedule 101 Addendum;

- Conex Storage and Shipping containers (three), each approx., 20' Long;

- Assorted office equipment and furniture, to the extent there is any;

- 2010 Dodge 2500 pickup truck; and

- Intellectual property, if any exists, including name rights to Northwest Gold Diggers.

Collectively, the property subject to sale is referred to as the "Assets."

The first motion sought authority to sell the Assets by public auction. The auction would be conducted by Ritchie Brothers Auctioneers, and would initially be conducted over the internet. The internet auction would be subject to a minimum reserve bid. If no qualifying bid was received, Ritchie Brothers would proceed to sell the Assets at its October 5, 2019 auction held at its Wasilla location. No reserve would apply to the October 5 auction.

In the motion for authority to conduct the auction, the Trustee advised that he was also negotiating with the minority owners of the debtor for a private sale of the Assets. The Trustee disclosed that if the estate could agree to terms with them, he would file a separate motion concerning a private sale.

On May 24, 2019, the Trustee filed his Motion for Approval to Sell Assets, Free and Clear of Liens, to NWG/Pomrenke (Private Sale Motion) (ECF No. 50). The Trustee proposed to sell the same Assets to Northwest Gold Diggers, LLC (NWG), Shawn Pomrenke, Steven Pomrenke, and Christine Pomrenke for a purchase price of $1,036,500. NWG owns roughly 34% of the debtor. The Pomrenkes own NWG.

The buyers would pay $400,000 at closing, with the balance due at the earlier of either: (a) a year after closing, or (b) 30 days after demand is made by the Trustee once the claims deadline expires and any claims objections to non-insider claims are adjudicated. The claims deadline expires on July 17, 2019. Additionally, the buyers would be permitted to offset the balance of the note against their allowed proofs of claim. The balance due under the agreement accrues interest at 6% per annum, and would be secured by the assets being sold.

Finally, the buyers have agreed to subordinate their claims to the payment of the allowed, timely filed unsecured claims and administrative expenses. Combined, the buyers have filed claims totaling $1,954,428.52. Of this amount, Shawn Pomrenke asserts that $240,000 is secured by a maritime lien, which he has agreed to subordinate as well. The remainder of claims are general, unsecured claims.

The debtor, Pomrenke Mining, LLC, objected to the proposed private sale. So did Blue Water Gold, LLC and Blue Water Mining, LLC (collectively, "Blue Water"), who together own the majority interest in the debtor. Carol Bavousett Mattick, PLLC, creditor and the debtor's pre-bankruptcy counsel, also objected to the private sale. The objections challenge the Trustee's decision to sell the assets to the Pomrenkes. They contest the Trustee's due diligence, and argue that a public auction should be given the chance to

drive up the sales price. Blue Water has recently objected to the buyers' proofs of claim as well. *See* ECF Nos. 88-91.

The court conducted hearings on the two motions to sell. On June 17, 2019, the court heard the opening arguments of the parties. On June 24, 2019, the court took evidence and heard testimony from Shawn Pomrenke, the Trustee, Steve Runyon from Ritchie Brothers, and Desiree McDougal, former controller for the debtor. After taking evidence and hearing the arguments of counsel, the court tentatively ruled that it would grant the motion for authority for a private sale and deny the motion for sale by public auction as moot. The court now incorporates by reference those oral findings made on the record, and supplements its tentative ruling as follows.

The Trustee seeks to sell the estate's assets under § 363(b). He also seeks to selll the assets free and clear of liens and encumbrances, though the only known encumbrance is Shawn's potential maritime lien. Section 363 requires that the proposed sale be in the best interests of the estate and yield "optimal value under the circumstances." *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288 (B.A.P. 9th Cir. 2005). Proposed sales are, therefore, reviewed to determine whether they are within the best interests of the estate resulting from a fair and reasonable price, are supported by a valid business judgment and proposed in good faith. *240 North Brand Partners, Ltd. v. Colony GFP Partners, L.P. (In re 240 N. Brand Partners, Ltd.)*, 200 B.R. 653, 659 (B.A.P. 9th Cir. 1996) (citing *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal.1991)); *Slates v. Reger (In re Slates)*, 2012 WL 5359489, at *11 (B.A.P. 9th Cir. Oct. 31, 2012). Generally, courts afford considerable deference to a chapter 7 trustee's business judgment when considering a proposed sale under § 363, as they are statutorily

charged with the prompt liquidation of the estate. *In re Alaska Fishing Adventure, LLC,* 594 B.R. 883, 889-90 (Bankr. D. Alaska 2018). Sales to an insider, however, are subject to heightened scrutiny. *Id.* at 887 (citing *Mission Product Holdings, Inc. v. Old Cold, LLC (In re Old Cold, LLC),* 558 B.R. 500, 516 (B.A.P. 1st Cir. 2016)).

### A. A Fair and Reasonable Price.

Obviously, price is the starting point and cornerstone of most sales. What is a fair and reasonable price implicates an acceptable range of return from the sale measured against the unique circumstance of that case. In this instance, the circumstances surrounding the Assets and proposed sales dramatically affect their optimal value in this case.

First, the list identifying the property subject to the sale included a value or price for each item assigned by Shawn Pomrenke. Using these amounts, the total value of the property is $1,116,500. This is $90,000 more than the buyer's offer of $1,036,500. Shawn testified that the buyers decided to offer an amount less than this cumulative value to the estate.

Despite the amount of testimony produced, valuation of the assets and any comparison to the offer is difficult. The debtor's schedules value the combined Assets at $3,013,195. The three vessels account for $2,200,000 of the total valuation. However, Blue Water, the majority owner of the debtor never discussed, or explained, the valuations of the assets in the Schedules. More importantly, Shawn testified, consistent with the notations on the property list attached to the motion for private sale, that there were numerous problems with the Assets. He also testified that he had purchased the Christine Rose roughly 13 years ago or so for the amount he valued it in his property list,

$350,000. Similarly, he testified that he had purchased the Tuvli 160 for $150,000, and the Tuvli II for $450,000. Shawn attributed $150,000 for the Tuvli 160 in his listing, but valued the Tuvli II at only $100,000 due to damage sustained from a lease of the vessel. According to Shawn, all of the vessel were in need of serious work and repairs, though the damages to the Tuvli II affected its valuation the most. His testimony on these points was unrebutted, and credible. For these reasons, the court finds that the valuation of the Assets in the Schedules is of no probative value in deciding the competing motions.

The Trustee has also provided information from Ritchie Brothers regarding the value of the Assets. Ritchie Brothers provided a range of values for the Assets tied to a potential auction. It established a "notify price," equating to the reserved minimum bid for which each specific item could be sold, the "asking" price, and a "buy it now" price at which anyone could end the auction by purchasing the item at this higher price. Taken together, Ritchie Brothers computed a total "notify" price of $1,327,500, a combined "asking" price of $1,764,500, and if all of the assets sold for the "buy it now" price the estate would receive $2,004,500.

The testimony of Mr. Runyon shed some additional light on these estimates. Mr. Runyon explained that these valuations were generated by attempting to find comparables within its database. Ritchie Brothers attempted to categorize the individual items as best it could to generate such comparables. For example, Mr. Runyon explained that for the Christine Rose which is a barge with an excavator attached to it, Ritchie Brothers valued the barge and the excavator to arrive at its range. Mr. Runyon further explained that in creating the comparables and the resulting range, it relied upon information such as Coast Guard reports provided by counsel for the debtor.

Ritchie Brothers did not inspect the Assets, or even discuss the condition of the items with Shawn Pomrenke, the person most knowledgeable about their condition, in setting these value ranges. It did, however, learn more about the condition of the Assets after its representative returned from an April 2019 trip to Nome. In April, the Trustee, together with a representative from Ritchie Brothers, traveled to Nome to look at the assets. They discovered that the Assets had been left uncovered on NWG's property, and out of shelter, throughout the winter. The parties submitted into evidence pictures taken by the Trustee during that visit showing an ATV under roughly five feet of packed snow with the handle bars and a cage, presumably attached to the back end of the ATV, poking through the snow. Another picture showed the Ophir with two outboard motors still affixed, but one was without a cowling to cover the motor. The testimony established that the motor was without the cowling throughout the winter. The Trustee further testified that for the Tuvli II, a section of steel plating was missing and he could see through the vessel. No maintenance or work was performed on any of the assets after the bankruptcy filing when the items became property of the bankruptcy estate. Despite this information, and the concerns raised, Mr. Runyon emphatically stated that Ritchie Brothers did not revise its valuation range to account for the actual condition of any item, and would not until a contract was signed to employ it and full inspections were performed. Mr. Runyon did concede that Ritchie Brothers was aware that the Assets had been left out over the winter, were not maintained, and that there were some significant issues with a number of items that could negatively affect the total valuations.

Mr. Runyon also candidly recognized that the market for the sale of these items in Nome was exceedingly small. Nome is a small city on the tip of the Seward Peninsula on

the Bering Sea. The testimony at the hearing estimated its population to be somewhere around 3,000 persons. Like many small Alaskan cities, it is inaccessible by car from Anchorage or Fairbanks. Though the auction would permit people throughout the world to bid, the successful bidder would need to use the items in Nome, or transport them out of Nome. Either scenario either reduces the pool of bidders, or depresses the price for the cost (and time) of transportation.

The court finds Mr. Runyon to be very credible. More to the point, his testimony precludes any reliance upon Ritchie Brothers' initial range of values. Ritchie Brothers' valuation represents an idealized valuation of the Assets without regard to the actual, present condition of each item or its use. Nor does it account for the location of the items, the narrow market, or the costs to move the property. By way of example, Mr. Runyon stated that the recreational and all terrain vehicles most likely would need to be moved to Ritchie Brother's yard in Wasilla for sale at the October 5th auction where they could be made more readily available to a wider market. However, there was no discussion of the cost and time necessary to transport these items to Wasilla. Transport would presumably require barging the items out of Nome. Although there is no evidence as to the exact cost, common sense suggests that it would not be cheap, and would negatively affect the net recovery to the estate for the benefit of the unsecured creditors.

The court shares the Trustee's concerns that the Assets are either uninsured or will become uninsured in the very near term. That the Trustee cannot place insurance is troubling, and militates strongly for a prompt sale.

While the objecting parties do not address the costs of storage, this is another factor that supports a prompt sale. Most of the Assets are stored on NWG's property.

NWG has apparently not collected storage charges in the past, but includes them as part of its proof of claim. If NWG is not buying the Assets and not using them, the estate must either move the Assets or pay for storage. NWG is charging $1,500 per month for the three recreational vehicles on its property, and $2,000 for the other Assets on its property. The post-petition storage charges are likely to constitute administrative expenses entitled to priority. From the petition date through the auction in October, this would result in administrative expenses of $24,500 for storage.

The timing of the auction also suggests that it could negatively impact the estate's recovery. The debtor used the Assets for offshore gold mining. The testimony at the hearing was that the offshore gold mining season in Nome varies greatly depending on the weather, but it generally starts in June and lasts for roughly 100 days. Accordingly, the season has started, and the value to anyone wanting to use the Assets for this year is quickly disappearing. To the extent that the Assets do not sell on the internet auction, they would be left in Nome through October (unless transported down to Wasilla). It is unclear how, or when, a bidder could take possession of the items outside of Nome. Indeed, it is questionable whether one could transport the Assets out of Nome by mid-October. A public, no reserve, auction in October for the Assets located in Nome would only serve to depress the value of those assets given concerns of storage, transportation, and deterioration of their condition if left unprotected for another winter.

In short, the court finds that the current condition of the Assets, their location in Nome in an open yard, the beginning of the offshore mining season, the storage costs being incurred, and the lack of (or imminent lack of) insurance for the Assets all weigh heavily in favor of a quick sale of all the Assets as a package to a buyer that is motivated

to take the Assets now while there is still time in the current mining season. Moreover, the only credible valuation of the Assets, performed by Shawn Pomrenke, justifies a sale price of 92% of that valuation. Even when measured against the "notify" price used by Ritchie Brothers, the private sale results in the estate receiving 94% of the estimated low end of the auction once the 10% commission is deducted.[1]

The court notes, as raised at the initial hearing on these motions, that no other offers have been received, and no one appeared at either hearing to express interest in purchasing any, much less all, of the Assets. While the objecting parties have intimated that there are persons out there that are interested in purchasing some part of the Assets, no one has come forward. While the court must take a closer look at any sale to an insider, it has done so and finds the sale price for all of the Assets to be fair and reasonable.

**B.**     **A Valid Business Judgment.**

The circumstances impacting the court's considerations of the fairness and reasonableness of the purchase price similarly impact the determination that the Trustee had a valid business reason for moving forward with the private sale. The Assets are physically far from the Trustee's control and oversight. They are uninsured. And they are out in the open. The vessels are not being repaired or used, and have sat idle through the winter. Moreover, the estate will incur costs to store the Assets. A very experienced chapter 7 trustee has reviewed the Assets and evaluated the prospects for sale. In the

---

[1] Ritchie Brothers estimated a total of $1,327,500 for the "notify" price. Less the 10% commission, the estimated net sales to the estate would be $1,194,750 ($1,327,500 - $132,705 = $1,194,750). This ignores any additional costs of sale including transport to Wasilla and storage costs. Of course, it also assumes a qualifying minimum bid for each item and ignores the potential for higher sales prices.

exercise of his business judgment, he would rather take the bird in hand. Based on the testimony, the court agrees that this is a sound business judgment. While there is a possibility that an auction might generate a greater return, there was nothing presented at the hearing that suggests that such a result would happen. Rather, a piecemeal auction of the Assets in their current location and condition may very well return substantially less, while exposing the estate to greater risk, and incurring additional costs.

The objecting parties make much of the Trustee's decision not to examine the financial ability of the buyers. However, there is very little risk as to the initial payment of $400,000 as the buyers have placed that amount in their counsel's trust account. Shawn Pomrenke testified that these funds came from NWG's inland mining operations, and that he would be able to raise the remaining money as needed. He did admit, however, that he would not be able to pay the full purchase price in cash immediately upon court approval.

The ability to raise the $400,000 is some evidence of financial ability. Desiree McDougal provided financial statements for NWG derived from its 2017 activities to show that it had struggled in 2017. These financials are of limited value on their own, and without further context as to how they may translate to NWG's current operations divorced from the debtor and Blue Water. While it is not ideal that the Trustee has not examined the buyers' finances at all, this does not negate the business judgment to sell the assets, collect the $400,000 now, and see what obligations remain after the claims objection process. Moreover, the Trustee has negotiated to secure the balance of the note against the Assets. Given the substantial down payment, there is $1 million in Assets securing a debt of roughly $600,000. This is sufficient to support the private sale.

### C. Proposed in Good Faith.

The objecting parties also argue that Shawn Pomrenke's actions preclude a sale to him because he has previously acted in bad faith. Specifically, they contend that he posted comments on social media to discourage interest in the purchase of the Assets. Additionally, they argue that he must have known of the damage to the Tuvli II when it occurred in 2017, but failed to make an insurance claim. Finally, the objecting parties contend that he failed to maintain and repair the Assets over the winter.

Again, much is made that the sale is to an insider and additional scrutiny is required. Such scrutiny is appropriately required to ensure that the insiders are not receiving favored treatment or receiving a sweetheart deal. For the reasons stated above, the evidence establishes that the trustee has considerable reasons for wanting to sell all of the Assets now, at the current sales price, even if it is to an insider. The court has found the sales price fair and reasonable. And there are valid reasons for the structure of the sale: a substantial down payment, with the balance accruing interest and secured by the Assets being sold, which shall be due in full within a year or sooner depending upon the outcome of the claims objections.

Of course interference in the estate's efforts to sell the Assets is improper. The exact nature of the social media posts was not presented to the court, and the timing is unclear. The Trustee's counsel apparently advised Shawn to stop when the bankruptcy was filed. There is no evidence that such actions continued. As for the failure to make an insurance claim, the Trustee is not releasing any claims as part of this sale. That point was made and emphasized at the hearing. Any such claims against Shawn remain property of the estate. Finally, it is unclear what Shawn was supposed to do over the

winter months with the Assets.  He stored them at NWG's yard.  From the testimony, it appears that the Assets were not treated any differently than in years past - except that when spring approached annual maintenance was not performed on the Assets as would have occurred outside of bankruptcy.  But once Blue Water placed the debtor into bankruptcy on March 15, 2019, Shawn was divested of any right to exercise control over the Assets.

The activities in this bankruptcy, and as pertains to the sales motions, demonstrates a significant level of hostility and contentiousness between Blue Water and the Pomrenkes.  The evidence presented at the hearing does not provide the requisite context to understand the basis for the hostility between the parties.  For purposes of the motions, however, the court need not further examine the relationship between these factions, or the actions of Shawn Pomrenke.  Whatever other actions he has taken, the court finds that the sales offer was made and negotiated in good faith.  That objecting parties do not like that the Trustee is selling the Assets to Shawn Pomrenke is beside the point.  If they wanted a different outcome, they should have submitted a better bid.  They did not.

For these reasons, and those stated on the record at the hearings,

The Motion is GRANTED, as follows:

1. The Trustee shall sell the Assets, listed on Exhibit A to the *Offer to Purchase Assets from the Pomrenke Mining, LLC Bankruptcy Estate* (ECF No. 50, Ex. A) (the "Offer") attached hereto, to Northwest Gold Diggers, LLC, and its members Shawn Pomrenke, Steven Pomrenke, and Christine Pomrenke (collectively "Buyers"), on the terms set forth in the Offer.

2. For purposes of calculating the 30-day period set forth in paragraph 4, page 2 of the Offer, objections to, and adjudications of, the Buyer Claims shall be ignored.

3. Such sale shall be free and clear of the liens and claims of all persons receiving notice of the Motion or the hearing thereon. The liens and claims, if any, of persons in the assets sold shall attach to the sale proceeds to the same extent and in the same order of priority as in the underlying assets, *except* that the Buyers shall subordinate their maritime liens or other claims or liens against the sale proceeds to "Allowed Claims" as defined in the Offer to Purchase and administrative expense claims. There shall be no disbursement of any of the sale proceeds without further court order.

4. The Trustee's *Motion to Sell Assets of Estate By Public Auction, Free and Clear of Liens, and to pay Ritchie Bros., Auctioneer,* Docket 36, is DENIED as moot.

Dated June 28, 2019.

By: /s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge

Attachment:
Offer, with Exhibit A thereto

Serve: J. Travostino, Esq.
M. Mills, Esq.
M. Boutin, Esq.
C. Christianson, Esq.
K. Battley, Trustee
U.S. Trustee
ECF Participants via NEF
Case Manager

3FF35: ? 7@F A

# OFFER TO PURCHASE ASSETS FROM THE POMRENKE MINING, LLC, BANKRUPTCY ESTATE

This "Offer to Purchase Assets From the Pomrenke Mining, LLC, Bankruptcy Estate" ("Offer to Purchase") is made by Northwest Gold Diggers, LLC ("NWG"), and its members Shawn Pomrenke, Steven Pomrenke, and Christine Pomrenke (collectively "Buyer"), to Kenneth W. Battley, Trustee ("Seller"), Trustee appointed in *In re: Pomrenke Mining, LLC,* United States Bankruptcy Court for the District of Alaska main Case No. 19-00083-GS (the "Case"). This Offer to Purchase is dated as of May 23, 2019.

The terms of this Offer to Purchase are subject to bankruptcy court approval and nothing stated herein is binding absent bankruptcy court approval.

Buyer hereby submits this Offer to Purchase property under the terms stated below, subject to satisfaction of contingencies as stated below. In consideration of and as a condition of the Seller selling the Property and the Buyer purchasing the Property and other valuable consideration, Buyer makes this Offer to Purchase the Property as follows:

Buyer Claims. As of the date of this Offer to Purchase, NWG has filed Proof of Claim No. 1 in the Case in the amount $792,182.52; Christine Pomrenke ("Christine") has filed Proof of Claim No. 2 in the amount $194,301.00; Steve Pomrenke ("Steve") has filed Proof of Claim No. 3 in the amount $387,000; and Shawn Pomrenke ("Shawn") has filed Proof of Claim No. 4 in the amount $580,000. Shawn's proof of claim asserts a perfected maritime lien on certain vessels, as set forth in more detail in his proof of claim. These four claims, together with any allowed administrative expense claims of NWG are collectively referred to herein as "Buyer Claims." NWG has paid post-petition insurance premiums and will file an administrative expense claim for the premiums paid. NWG's allowed administrative expense claim will be paid in normal course and is not part of Buyer Claims as set out in this Offer to Purchase.

Property to be Purchased
The description of the Property to be purchased is all items on the attached list. The Property on the attached list is collectively referred to as the "Property." The attached list references values attributed to each piece of property and condition taken into consideration for fixing of the stated values. The price offered is also based on the sale of the assets in total.

Purchase Price
Buyer offers to purchase the Property for $1,036,500.00 ("Purchase Price"). The Purchase Price shall be paid to Seller as follows:

1) $400,000.00 to be paid in cash at Closing, with the balance of the Purchase Price to be evidenced by a Promissory Note to Seller signed by each Buyer. The Promissory Note shall carry interest at the rate of six percent (6%) per annum, and shall call for no monthly payments, but is subject to paragraph 4) hereof, and shall in any event be due in full in one year from Closing. At the Seller's election, the Promissory Note shall be secured by preferred ship mortgages on the USCG registered

Exhibit A
Page 1 of 5

vessels, and by ship mortgages and security agreements on the other vessels and vehicles. The holders of the Buyer Claims shall subordinate any maritime liens they assert to the ship mortgages and other security interests in favor of Seller.

2) At Closing, the holders of the Buyer Claims each agree to subordinate payment of their claims to payment of all administrative expenses in the Case, and also to subordinate payment of their claims to any and all Allowed Claims, as defined in paragraph 4 below, in the Case *other* than the Buyer Claims. Buyer Claims are not subordinated to claims of other owners for purposes of equity distribution.

3) At such time as the Seller closes out the Case after payment to Allowed Claims as defined in paragraph 4 below, and after credit for allowed Buyer Claims against the Note balance, then to the extent that there is still a balance due on the Note, then Seller will divide the Promissory Note into one or more Subnotes in accordance with court determined division of equity interest percentage due each owner. When this division occurs, then the total balance of all the Subnotes shall equal the balance due on the Promissory Note before such division; each Subnote shall be separately enforceable by the holder of such Subnote; and the Seller shall determine the extent to which the security agreements and mortgages securing the Promissory Note shall secure payment of each Subnote. The Seller shall distribute unsecured Subnotes to the holders of the equity owner claims as determined by the court,, and each equity owner shall agree to accept such Subnotes as dollar-for-dollar credits in distribution of equity.

4) If Seller learns after the proof of claim deadline and after all objection to claims have been adjudicated that the cash in the estate (including the $400,000.00 paid by Buyer and other assets liquidated), is insufficient to pay all Allowed Claims, including administrative expense claims, then within thirty (30) days of demand, Buyer will pay to Seller additional cash as needed to pay Allowed Claims and administrative expense claims. The additional cash will be credited toward the Promissory Note balance. "Allowed Claims" shall be defined as timely filed claims after all claims objections are heard and adjudicated and allowed administrative expense claims. Allowed Claims do not include claims for equity distribution to owners and Buyer is not subordinating its equity interests to other members of Pomrenke Mining, LLC ("the LLC") for purposes of distribution of equity. Seller and Buyer shall each have the right to object to any proof of claim filed and such rights are not waived by anything in this Offer to Purchase, *except* that Buyer hereby agrees to accept unsecured Subnotes as dollar-for-dollar credits to distributions on account of their equity interests, even though Seller may distribute secured Subnotes to other members of the LLC on account of their equity interests.

Closing and Possession
The Closing Date and turnover of possession of the Property will be immediately following and no later than 10 days following the entry of an Order in the Bankruptcy Case approving Seller to sell the Property to Buyer.

Conditions and Contingencies
1) Entry of an Order in the Bankruptcy Case approving Seller to sell the Property to Buyer.

2) Issuance by the Trustee a Bill of Sale concerning all Property on the attached list.

3) A Bill of Sale for each USCG registered vessel on the USCG form Bill of Sale signed by Kenneth W. Battley, Trustee of the Pomrenke Mining, LLC, bankruptcy estate, to NWG.

Case 19-00083    Doc 50    Filed 05/24/19    Entered 05/24/19 13:48:42    Desc Main
Case 19-00083    Filed 06/28/19    Entered 06/28/19 17:09:43    Doc# 111    Page 18 of 20
Document    Page 19 of 20
OFFER TO PURCHASE
May 24, 2019
Page 3

4)  Seller agrees to execute any other documentation required to effectuate the transfer of the attached Property to Buyer.

5)  Buyer accepts the Property "AS IS" and "WHERE IS" and with all faults.

<u>Acceptance</u>
Upon Seller's acceptance of this Offer to Purchase, Seller will take all steps necessary to obtain Bankruptcy Court Approval of this Offer to Purchase, but without prejudice to the Seller simultaneously seeking approval of sale of the Property by public auction.

Dated this _____ day of May, 2019, as of May 23, 2019.

_____
Shawn Pomrenke, individually and as member
Of Northwest Gold Diggers, LLC

Dated this _____ day of May, 2019, as of May 23, 2019

_____
Steve Pomrenke, individually and as member
Of Northwest Gold Diggers, LLC

Dated this _____ day of May, 2019, as of May 23, 2019

_____
Christine Pomrenke, individually and as member
Of Northwest Gold Diggers, LLC

## LIST OF PROPERTY

1. The Christine Rose, a near shore dredge vessel, approx. 80' Long, 20' Beam; Hull #: 175265.    $350,000.

   Including modifications: Custom built wash plant consisting of a gantry and spud system, a Caterpillar 320L excavator, winches, customer built anchors, water pump, in/out drives and an enclosed control center. Outdrive motor blown up. 3208 Cat 25; Hull needs replacement.

2. The Golden Girl, a 2004 North River aluminum skiff, approx., 20' Long; Hull #: NRBE0481D404. $15,000.

3. The Tuvli I (a/k/a Tuvli 160), a 1968 welded steel flat deck cargo barge, approx., 157.5 Long, 45' Breadth; 10.3' Depth; Hull ID or Official # 516564. $150,000.00   Bottom plating needs to be replaced.

4. The Tuvli II, a 1954 M/V Liteweight mechanized landing craft, approx. 65' Long, 21' Beam, 8.3' Depth; Hull ID or Official No.:1086223. $100,000.00. Damaged bottom from lessor.

5. Raw Materials for a Custom Built Wash Plant for the Tuvil 1, including Screen Deck and other materials. $90,000.00. Value listed on schedules states "unknown."

6. The Havilah, a 2012 aluminum dredge Catamaran, approx., 50' Long, 16' Beam, Hull ID #: YBGA1382A012. $200,000.00.

   And accompanying trailer: 1986 two-axle welded aluminum trailer, mfg. by Associated Boat Transport; approx. 48'; VIN #WA78107391. $15,000.

7. The Ophir, a 2012 welded aluminum Swiftsure; approx. 30' Long, Hull ID#: LSB30058F012, and accompanying trailer: $80,000.00. Shift cable broken and port motor not running.

   And accompanying trailer: 2012 King KTB10500B3 Trailer; approx. 28' Long, 12,504 lbs. carrying weight; VIN #4XBB33232CA010992. $8,000.00. Too small for boat.

8. 2011 EnduraMax RV 30MFW, propane, VIN # 5UEFG03XBN001063; AK Regis: 3843001. $15,000.00. Poor condition.

9. 2011 EnduraMax RV 33MFW, propane, VIN # 5UEFG3423NB001093, AK Regis: 3839000. $20,000.000. Fair condition.

10. 2011 EnduraMax RV 4012END, propane, VIN # 5UEFG3025BN000985; AK Regis: 3838999. $30,000.00. Fair condition.

11. Polaris Ranger Crew 800 – 6 person All Terrain Utility Vehicle with dump bed, gasoline; VIN # 4XAWH76A0CE292632; TX Regis; 104402719. $4,000.00. Broken drive axle.

12. Polaris Sportsman X2 550 – 2 person All Terrain Vehicle, gasoline; VIN # 4XATN55AXCA349816 TX Regis: 104402720. $2,500.00.

13. Assorted mining and dive equipment, electronic equipment, shop supplies and equipment, office supplies and equipment, kitchen and household goods, all as set forth in Schedule 101 Addendum. $15,000.00.

14. Conex Storage and Shipping containers (three), each approx., 20' Long. $7,000.00. Value unknown on schedules.

15. Assorted office equipment and furniture to the extent there is any. No office equipment is listed on the schedules. No value.

16. 2010 Dodge 2500 pickup truck, VIN # 3D7UT2CL1AG130706, AK license is GRE299 and expired. Value $15,000. Registration is in name of Jon Keith Byer. Financing noted TD Auto Finance, LLC. $15,000.00

17.     Intellectual property, if any exists, including name rights to Northwest Gold Diggers.

Total $1,036,500.00