## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ALASKA

In re:

POMRENKE MINING, LLC,

Debtor.

Case No. 19-00083-GS
Chapter 7

### MEMORANDUM DECISION ON OBJECTION TO PROOF OF CLAIM NO. 6

Northwest Gold Diggers, LLC (NWG) has objected to Proof of Claim No. 6 (Claim) filed by attorney Carol Bavousett Mattick (Mattick) for pre-petition legal services provided to the debtor. For the reasons stated below, the court will overrule the objection in part and sustain the objection in part.

### FACTS

A.   Pre-petition Events

NWG is an Alaskan limited liability company engaged in off-shore gold mining in Nome, Alaska. It is co-owned by Steven and Christine Pomrenke, and their son Shawn. The company, and Shawn Pomrenke in particular, gained some notoriety from his ongoing participation with the Discovery Channel for a reality television show featuring the gold mining operations. In 2016, Jon Keith Byer (Byer) approached the Pomrenkes to discuss expanding their gold mining operation. Byer was the manager of two entities, Blue Water Gold, LLC and Blue Water Mining, LLC (Blue Water Entities), interested in investing in, and expanding, NWG's gold operations.

Ultimately, NWG agreed to create a new entity, Pomrenke Mining, LLC, to expand and continue NWG's operations. NWG and the Blue Water Entities comprise the members of Pomrenke Mining. NWG and Blue Water Gold contributed the majority of assets to the new company pursuant to an Asset Purchase Agreement (APA) drafted by Mattick, counsel for the Blue Water Entities. The APA was executed contemporaneously with the Pomrenke Mining Company Agreement, which

1

served to "set forth in full [the] respective rights and obligations" of the initial three members of Pomrenke Mining: the Blue Water Entities and NWG.[1]  Both documents were dated June 10, 2016, and were signed by Steven and Shawn Pomrenke, who at the time of signing were each 50% equity holder in NWG.[2]  As set forth in the Company Agreement, also drafted by Mattick, NWG acquired a minority interest in Pomrenke Mining with the balance of the membership interests owned by the Blue Water Entities.[3]  Byer was designated the president and chief operating officer of Pomrenke Mining.[4]  Steven and Shawn Pomrenke, together with Byer, comprised the board of managers for the company.[5]  The Pomrenkes, who live in Nome, were to run the mining operations.  Byer, who resides in Texas, was responsible for the day to day matters, and was charged with raising investments to provide working capital to the new business with the intent of expanding its operations.

Mattick is a practicing attorney admitted to the State Bar of Texas since 1984.[6]  She issued an engagement letter (First Engagement Letter) dated February 15, 2016 to Byer as manager of the Blue Water Entities.[7]  Per the First Engagement Letter, Mattick was retained to "put together a structure for [the] proposed business combination with [NWG] and an equity financing of the

---

[1] NWG Trial Exh. 5.

[2] *Id.* at Exh. 5-6.

[3] *Id.* at Exh. 5, p. 37.

[4] Mattick Trial Exh. 3, p. 2.

[5] NWG Trial Exh. 5, p. 6.

[6] Mattick Trial Exh. 2.

[7] NWG Trial Exh. 2.

combined entity."[8]  She identified the effective date of the representation as December 1, 2015.[9]

Byer signed the First Engagement Letter as manager of both Blue Water Entities, and as an

individual guarantor.[10]

Several months after the execution of the Company Agreement and APA, Mattick prepared

a second engagement letter (Second Engagement Letter) dated September 1, 2016, which was

intended to be  "a formal agreement with the new company, Pomrenke Mining, LLC."[11]  Under the

Second Engagement Letter, Pomrenke Mining retained Mattick as counsel to provide the following

representation:

> My firm has and will continue to provide corporate and securities
> legal services to Pomrenke Mining including preparation of two
> information disclosure packages, one for use with potential
> traditional lenders and one for use with potential equity investors;
> ensuring compliance with notice filing requirements of any securities
> offerings, preparation of employment or consulting agreements or
> other contracts, and documentation of corporate governance actions
> and changes to governing documents.[12]

Mattick listed her billing rate at $350.00/hour, and estimated a total of $50,000.00 in legal

fees for the services to be provided.[13]  Additionally, the Second Engagement Letter provided that

"[a]ny invoice remaining unpaid for more than 30 days from the date of invoice will bear interest

at a rate of eighteen percent (18%) per annum."[14]  The effective date of the Second Engagement

---

[8] *Id,* p. 1.

[9] *Id.*, p. 3.

[10] *Id.*

[11] *Id.* at Exh. 4, p. 1.

[12] NWG Trial Exh. 4 at 1.

[13] *Id.*

[14] *Id.*

Letter was July 1, 2016.[15]  It was signed by Byer as president and chief operating officer of Pomrenke Mining.[16]

Mattick's retention by Pomrenke Mining under the terms of the Second Engagement Letter was ratified by the board of managers of Pomrenke Mining pursuant to a unanimous written consent dated September 12, 2016 (Consent).[17]  The Consent was signed by Byer on September 12, 2016, and by Steven and Shawn Pomrenke on September 14, 2016.[18]

According to her billing statements to the Blue Water Entities, Mattick stopped sending invoices to them as of June 2016.[19]  Mattick actually began billing Pomrenke Mining in July 2016, but those fees are not included as part of her Claim against Pomrenke Mining.[20]  Mattick's October 2016 billing statement shows that the outstanding balance billed to Pomrenke Mining was paid on October 15, 2016, to bring her fees current.  Accordingly, her Claim begins with invoices from October 2016, the month after the Second Engagement Letter and the board of managers' Consent.[21]  The initial unpaid invoice demonstrates that less than a month after her Second Engagement Letter she raised her hourly billing rate to $375.00.[22]  She testified that she did not provide written notice

---

[15] *Id.* at p. 2.

[16] *Id.*

[17] Mattick Trial Exh. 5.

[18] *Id.* at pp. 2-3.

[19] *See id.* at Exh. 6; NWG Trial Exh. 3, pp. 15-16.

[20] Mattick Trial Ex. 6.

[21] *See* NWG Trial Exh. 1.

[22] *See id.*; *see also* ECF No. 209, p. 3 ("I increased my hourly rate for all clients in the fall of 2016....").

4

of the hourly rate increase to Pomrenke Mining.[23]  Mattick sent her billing statements to Pomrenke Mining in care of its treasurer and secretary Desoree McDougal, Byer's daughter, who also resides in Texas.  She continued to submit billing statements to Pomrenke Mining thorough March 2019.[24]

Mattick's billings demonstrate that most of her time was spent attempting to assist Pomrenke Mining with issues relating to procuring investments or on corporate matters.  NWG does not take issue with these billings, at least not directly.  Mattick concedes, however, that throughout her representation of Pomrenke Mining, she invoiced it for some services that she performed for the Blue Water Entities.[25]  For instance, Mattick acknowledged that of the 24 hours she billed to Pomrenke Mining in October 2017, six of those hours were attributable exclusively to the Blue Water Entities.[26]  This is the most time she billed to Pomrenke Mining in any one month for work related to the Blue Water Entities.  Of the 30 months Mattick billed Pomrenke Mining, 13 of the monthly billing statements included some billings for the Blue Water Entities.[27]  These ranged from half an hour to the six hours billed in October 2017.

In June 2018, Mattick once again began to represent the Blue Water Entities on an active basis and restarted billing the Blue Water Entities separately.[28]  According to these statements, and Mattick's testimony, the Blue Water Entities began discussions with David Young regarding his

---

[23] Evidentiary Hearing Audio Recording, Mattick Testimony, ECF No. 217 at 1:25:00-1:27:10.

[24] NWG Trial Exh. 1.

[25] ECF No. 176, pp. 1-2.

[26] *See* ECF No. 225, p. 12.

[27] *Id.* at pp. 11-16.

[28] *See* NWG Trial Exh. 3, p. 18.

interest in Pomrenke Mining.[29]  Young is part owner in Arctic Sea Mining, owners of an inland mining company in Nome and an off-shore mining vessel.[30]  Originally, Young was thought to be a prospective investor in Pomrenke Mining, and was initially approached by Shawn Pomrenke.[31] Shawn Pomrenke then introduced Young to Byer.[32]  After reviewing the APA, Young shifted his interest from investing in Pomrenke Mining to acquiring Byer's interests in Pomrenke Mining.[33]

Thereafter, Mattick's work concerning Young was directed toward the possibility of him acquiring the Blue Water Entities's interests.[34]  She testified that she did not know that Shawn Pomrenke initially approached Young as a potential investor in Pomrenke Mining.[35]  Mattick billed no time to Pomrenke Mining in June 2018, but starting in late June and continuing in July 2018 she billed the Blue Water Entities for work related to Young and his interest in the Blue Water Entities.[36] From this point forward Mattick actively represented the Blue Water Entities in soliciting Young to purchase control of Pomrenke Mining by acquiring the Blue Water Entities's interests and billed

---

[29] *See id.* at pp. 18-23; Evidentiary Hearing Audio Recording, Mattick Testimony, ECF No. 217 at 2:55:49-2:56:01.

[30] Evidentiary Hearing Audio Recording, Shawn Pomrenke Testimony, ECF No. 218 at 2:52:42-2:53:19.

[31] *Id.* at 2:54:22-2:55:32; ECF No. 271-23, p. 26.

[32] Evidentiary Hearing Audio Recording, Shawn Pomrenke Testimony, ECF No. 218 at 2:55:49-2:56:01.

[33] *Id.* at 2:56:50-2:57-36; Evidentiary Hearing Audio Recording, Mattick Testimony, ECF No. 217 at 2:55:49-2:56:01.

[34] NWG Trial Exh. 3, pp. 18-23.

[35] Evidentiary Hearing Audio Recording, Mattick Testimony, ECF No. 217 at 2:07:14-2:07:46.

[36] NWG Trial Exh. 3, p. 18.

significant amounts of time on this endeavor.[37]  The deal with Young did not, however, come to fruition.[38]

The relationship between the Pomrenkes and Byer deteriorated throughout the summer of 2018.[39]  Byer had not procured the needed investment for Pomrenke Mining, which was never profitable.  As the mining season concluded, Mattick began to work on matters related to the management of Pomrenke Mining, which included expanding the board and consideration of liquidation.  Ultimately, Byer caused Steven and Shawn Pomrenke to be removed from their officer positions in the company.  Mattick billed Pomrenke Mining for miscellaneous matters during 2019 until the company filed for bankruptcy on March 15, 2019.

The following summarizes Mattick's billings, and includes the fees billed to Pomrenke Mining but attributable to the Blue Water Entities to demonstrate the intermittent nature of those billings.[40]  The chart also includes Mattick's separate billings for the Blue Water Entities resuming in June 2018, and the resulting shift of her focus from Pomrenke Mining to the Blue Water Entities.

| Month | Billings Pomrenke Mining | BWE Included PM | Billings Blue Water Entities |
|---|---|---|---|
| Oct-16 | 18.50 | | |
| Nov-16 | 25.75 | | |
| Dec-16 | 72.25 | | |

---

[37] *Id.*

[38] Evidentiary Hearing Audio Recording, Mattick Testimony, ECF No. 217 at 2:08:04-2:08:10.

[39] *See*, *e.g.*, ECF No. 48-3, pp. 3-4 (letter from Pomrenke Mining attorney Joan Travostino to the Pomrenkes detailing the decision to liquidate Pomrenke Mining and Byer's reasons therefor).

[40] As discussed further in subsection D below, the figures relating to the Blue Water Entities's billings in this chart reflect Mattick's reconciliation of time entries targeted by NWG at ECF No. 223. *See* ECF No. 225, pp. 11-16. Also, there are some minor discrepancies in Mattick's billing statements and the amount of actual fees charged. Mattick generally discusses these discrepancies in her Exhibit 3-Timeline Analysis attached to her latest Claim.  Those discrepancies are immaterial to the court's analysis.

| Month | Billings Pomrenke Mining | BWE Included PM | Billings Blue Water Entities |
|---|---|---|---|
| Jan-17 | 12.00 | | |
| Feb-17 | 71.00 | | |
| Mar-17 | 27.25 | 4.50 | |
| Apr-17 | 16.75 | 0.50 | |
| May-17 | 13.00 | | |
| Jun-17 | 33.75 | | |
| Jul-17 | 58.50 | | |
| Aug-17 | 14.00 | 0.50 | |
| Sep-17 | 12.50 | | |
| Oct-17 | 26.25 | 6.00 | |
| Nov-17 | 7.25 | 0.75 | |
| Dec-17 | 8.50 | 0.50 | |
| Jan-18 | 3.50 | | |
| Feb-18 | 0.50 | | |
| Mar-18 | 1.00 | | |
| Apr-18 | 1.00 | | |
| May-18 | 10.25 | 2.75 | |
| Jun-18 | 0.00 | | 4.25 |
| Jul-18 | 3.75 | 0.50 | 8.75 |
| Aug-18 | 2.50 | 0.25 | 6.50 |
| Sep-18 | 6.75 | | 17.25 |
| Oct-18 | 7.50 | 1.50 | 12.75 |
| Nov-18 | 5.50 | 1.00 | 0.00 |
| Dec-18 | 17.75 | 1.50 | 1.50 |
| Jan-19 | 4.00 | | 11.50 |
| Feb-19 | 7.00 | 2.75 | 3.50 |
| Mar-19 | 11.00 | | |
| **Totals** | **499.25** | **23.00** | **66.00** |

B.    <u>Post-petition Events</u>

Pomrenke Mining voluntarily filed its chapter 7 bankruptcy petition on March 15, 2019.

Mattick timely filed her original proof of claim in the amount of $226,727.72 for "legal services

performed."  Mattick attached a series of billing statements detailing services she provided

between October 10, 2016 and the petition date, together with a memorandum in support and a

calculation of interest.  The file number on the invoices attached to the original claim for services

8

provided to Pomrenke Mining was listed as 7245.0, the same file number Mattick assigned to the Blue Water Entities.

On July 29, 2019, NWG filed its objection to Mattick's claim (Objection).[41]  NWG raised multiple grounds for reduction of the original claim:

1.    18% interest is unreasonable and unconscionable;

2.    18% interest was waived because it was never added to the invoices;

3.    Mattick's billing rate of $375.00/hour is inconsistent with the Second Engagement Letter stating that her services would be billed at $350.00/hour;

4.    Time was excessively "block billed" in 8, 10 and 12 hour blocks;

5.    Invoices included time for tasks related to Blue Water Gold, LLC;

6.    Invoiced time was incorrectly calculated;

7.    Invoiced time exceeded the $50,000.00 estimate set forth in the Second Engagement Letter; and

8.    Invoiced time exceeded benefit to the debtor.[42]

NWG requested that the court reduce the original claim to "only reasonable fee time" incurred at $350.00/hour, with no pre-petition interest and 6% post-petition interest.[43]

Mattick responded by challenging the legal sufficiency of the Objection and argued that it failed to rebut the prima facie validity of her claim.[44]  Additionally, Mattick asserted the following:

---

[41] ECF No. 138.  ECF No. 139 is also NWG's objection to the Claim, with a copy of the Claim attached.

[42] *Id.* at pp. 2-3.

[43] *Id.* at p. 6.

[44] ECF No. 166 at p. 2.

1.  Mattick drafted the APA while representing the Blue Water Entities;

2.  Per the Second Engagement Letter her representation of Pomrenke Mining commenced July 1, 2016, but she sought compensation only for services provided to Pomrenke Mining beginning October 1, 2016 through the petition date;

3.  Pomrenke Mining agreed to the hourly rate increase from $350.00 to $375.00;

4.  The $50,000.00 figure for fees in the Second Engagement Letter was only an estimate, and only addressed the services listed in that letter;

5.  Though the invoices sent to Pomrenke Mining did not include interest charges, Mattick was not required by Texas law to include it; and

6.  Some charges for services provided to the Blue Water Entities were erroneously included in the billing for Pomrenke Mining.[45]

Mattick also stated that she never represented Byer.[46]  She further asserted that her simultaneous representation of the Blue Water Entities and Pomrenke Mining was not a conflict of interest and violated no rules of professional conduct or ethics.[47]

On September 11, 2019, the court held a scheduling hearing on the Objection, setting the evidentiary hearing for November 14, 2019.  Among other deadlines, September 18, 2019 was set as the deadline for any amendment to Mattick's original claim.[48]  Accordingly, on that date Mattick filed her amended Proof of Claim No. 6-2 and declaration in support of it.[49]  The amended claim deleted 19 hours of time entries attributable solely to the Blue Water Entities.[50]  It also

---

[45] *Id.* at p. 3.

[46] *Id.* at p. 2.

[47] *Id.* at p. 4.

[48] *Id.*

[49] ECF No. 172.

[50] *Id.* at p. 2.

included updated calculations and references to Mattick's work product.[51]  Mattick filed another amendment the next day, further reducing the total amount to $224,858.50.  This is the current Claim before the court.

On November 6, 2019, NWG supplemented its objection (NWG Supplement) to add multiple substantive arguments to its original Objection.[52]  Instead of seeking a reduction of the claim, NWG now requested disallowance in its entirety.  NWG alleged that Mattick's simultaneous representation of the Blue Water Entities and Pomrenke Mining constituted a breach of her fiduciary duty to Pomrenke Mining and the rules of professional conduct.[53]  NWG also pointed out that in the course of the bankruptcy proceeding, Mattick took an adversarial position to NWG.[54]  It further alleged that Mattick did not disclose to NWG, nor obtain its consent regarding, her simultaneous representation of Pomrenke Mining and the Blue Water Entities.[55]  Mattick filed a supplemental response brief (Mattick Supplement), arguing, among other things, that Texas law applies to her representation of Pomrenke Mining.[56]

---

[51] *Id.*

[52] ECF No. 206.

[53] *Id.* at pp. 1-2.

[54] *Id.* at pp. 2-3.

[55] *Id.* at pp. 5-6.

[56] ECF No. 209.

The presentation of evidence was concluded on November 14, 2019.[57]   On November 19, 2019, NWG filed a further supplement (Second NWG Supplement) identifying additional billing entries attributable to the Blue Water Entities which further reduced the Claim.[58]   Mattick filed another supplemental response on November 26, 2019,[59] and submitted additional exhibits providing updated hourly totals and interest calculations.[60]   According to Mattick's final adjustments, she calculated her Claim, as amended and revised, to be for a total of 502.75 billed hours.  From this total, she deducted a total of 23.00 hours that were erroneously billed to Pomrenke Mining instead of the Blue Water Entities.  Mattick added 4.00 hours, noting that she had overbilled a total of 11.25 hours, but underbilled a total of 15.25 hours.  Accordingly, she charged $181,406.25 for 473.75 hours billed at $375.00 per hour.  She then claimed accrued interest of $65,800.85, calculated at 18% compounded monthly, for a total unsecured claim of $222,863.35.

Closing arguments were held on December 2, 2019, and the matter taken under submission.

---

[57] At the conclusion of the evidentiary hearing, the court ruled on NWG's objection to Mattick's expert witness, Wayne Whitaker, whose report was included among Mattick's exhibits at Exhibit 18.  *See* ECF Nos. 191 (objection); 207 (Mattick response).  Mattick stated at the evidentiary hearing that she was relying upon Mr. Whitaker's testimony on the issues of the reasonableness of Mattick's fees and the alleged conflicts in her representation.  After hearing from the parties, the court struck Exhibit 18 due to its cumulative nature and because the testimony would not be helpful to the court in deciding those issues. Evidentiary Hearing Audio Recording, ECF No. 218 at 3:09:25-3:10:50.

[58] ECF No. 223.

[59] ECF No. 225.

[60] ECF No. 227.

**ANALYSIS**

A.    Preliminary Issues and Standards

    1.    Choice of Law

The work challenged by NWG was performed by Mattick from her office in Texas for a Delaware entity whose only operations were in Alaska, but was administered in Texas.[61]  Both parties have applied the Texas Rules of Professional Conduct to their arguments and NWG has conceded that Mattick's representations are governed by the Texas Disciplinary Rules of Professional Conduct.[62]  Mattick provided her legal services to Pomrenke Mining under a retainer agreement.  Generally, "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties ...."[63]  The parties agree that the court should apply Texas law to Mattick's representation of Pomrenke Mining, and accept that Texas had the most significant contact with her agreement to provide legal services for the debtor.  Indeed, the relationship arose in Texas as both Mattick and Byer signed the Second Engagement Letter there, Mattick had her office there, and performed her work in Texas.[64]

---

[61] ECF No. 209, p. 2.

[62] *Id.* at p. 5.

[63] Restatement (Second) of Conflict of Laws § 188 (1971).

[64] Mattick Trial Exh. 4 and ECF No. 209, p. 2.  Although Pomrenke Mining was involved in mining operations in Alaska, its corporate activities were based in Texas where it was also licensed to do business. *See* Closing Arguments Audio Recording, ECF No. 231 at 1:51:59-1:52:25;  Mattick Trial Exh. 1.

2.      General Standards for Claim Objections

Section 502(a) states that a proof of claim filed under Section 501 is "deemed allowed" unless an objection is made by a party in interest.[65]  Fed. R. Bankr. P. 3001(f) provides that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."  A debtor seeking disallowance of a proof of claim must present evidence which rebuts the presumption of prima facie validity.[66]  "The burden then shifts back to the claimant to produce evidence meeting the objection and establishing its claim."[67]  A creditor must establish its claim by a preponderance of the evidence.[68]  The evidentiary presumption notwithstanding, the burden of persuasion remains with the claimant.[69]

3.      Objection to Claims of Attorneys for the Debtor

An attorney can assert a claim for pre-petition debt owed by the debtor because it "is like any other contract claim against the estate...."[70]  Objections to proofs of claim for fees of an attorney who represented the debtor pre-petition are given additional scrutiny.  Section 502(b)(4) provides that a claim for services of an insider or attorney of the debtor shall not be allowed to the

---

[65] 11 U.S.C. § 502(a).

[66] *Litton Loan Servicing, LP v. Garvida (In re Garvida)*, 347 B.R. 697, 706 (B.A.P. 9th Cir. 2006); *see also United Student Funds, Inc. v. Wylie (In re Wylie)*, 349 B.R. 204, 210 (B.A.P. 9th Cir. 2006) ("The presumption may be overcome by the objecting party only if it offers evidence of equally probative value rebutting that offered in the proof of claim.").

[67] *Campbell v. Verizon Wireless S-CA, et al. (In re Campbell)*, 336 B.R. 430, 436 (B.A.P. 9th Cir. 2005).

[68] *See The Margulies Law Firm, APLC v. Placide (In re Placide)*, 459 B.R. 64, 72 (B.A.P. 9th Cir. 2011).

[69] *Garvida*, 347 B.R. at 706 (citing *Diamant v. Kasparian (In re So. Cal. Plastics, Inc.)*, 165 F.3d 1243, 1248 (9th Cir. 1999)).

[70] *Yermakov v. Fitzsimmons (In re Yermakov)*, 718 F.2d 1465, 1470 (9th Cir. 1983).

extent it exceeds the reasonable value of those services.[71]  The claimant bears the burden of proving the value of his or her services were reasonable.[72]

A bankruptcy court has broad discretion in assessing the reasonableness of an attorney's fees under § 502(b)(4).[73]  The determination of reasonableness under § 502(b)(4) is a question of federal law.[74]  "The bankruptcy code's reasonableness cap limits a pre-petition obligation for a debtor's attorneys' fees, even if such fees were allowable under state law."[75]  Thus, "'reasonable value' under § 502(b)(4) means more than merely 'enforceable under the law governing enforcement of the [Fee Agreement].'"[76]  Accordingly, "regardless of what [an attorney] may be entitled to under the Engagement Letter, its fees are subject to a reasonableness determination under [§] 502(b)(4)."[77]

In this circuit, "the primary method used to determine a reasonable fee in bankruptcy cases is to calculate the lodestar. A court computes the lodestar by multiplying the number of hours reasonably expended by a reasonable hourly rate."[78]  Before calculating the lodestar, however, the Ninth Circuit has held that the bankruptcy court must first examine the amount of the fee as

---

[71] 11 U.S.C. § 502(b)(4).

[72] *Placide*, 459 B.R. at 72.

[73] *Id.* at 73.

[74] *Id.*

[75] *McProud v. Siller (In re CWS Enterprises, Inc.)*, 870 F.3d 1106, 1119 (9th Cir. 2017).

[76] *Segovia v. Bach Construction, et al. (In re Segovia)*, 346 Fed.Appx. 156, 158 (9th Cir. 2009).

[77] *Placide*, 459 B.R. at 74-75.

[78] *Id.* at 73.

15

determined by state law.[79]  This is because "section 502(b)(4) works as a federal cap on a fee already determined pursuant to state law."[80]  Finally, "[u]nder § 502(b)(4), 'the term 'value' ... is synonymous with the concept of 'market value' or 'price' such that an attorney is entitled to fees up to the reasonable market value of his services."[81]

B.    NWG Claim Objections

NWG requests that the court disallow Mattick's Claim in its entirety because she had a conflict of interest throughout her representation of Pomrenke Mining.  Additionally, it argues that Mattick impermissibly mixed her billings to the Blue Water Entities with her billings to Pomrenke Mining.  NWG argues that this constitutes further proof of her conflict of interest, but also states a separate objection to specific fees charged to the Blue Water Entities.  NWG further argues that Mattick cannot charge 18% interest on the balance of her unpaid attorney fees, and even if she could she has waived any interest claims.  Finally, NWG contends that Mattick's applicable billing rate must be limited to $350 in accordance with her Second Engagement Letter rather than the $375 she billed to Pomrenke Mining.  The court considers each item in turn.

1.    Conflict of Interest

NWG seeks disallowance of Mattick's claim based upon her dual representation of the Blue Water Entities and Pomrenke Mining.  NWG argues that this created a conflict of interest that breached multiple professional rules imposed by the Texas Disciplinary Rules of Professional

---

[79] *CWS Enterprises*, 870 F.3d at 1115-1116.

[80] *Id.* at 1115.

[81] *Cotchett, Pitre & McCarthy v. Siller*, 2012 WL 1657620, at *15 (E.D. Cal. May 10, 2012) (quoting *In re Food Management Group*, 2008 WL 2788738, at *5 (Bankr. S.D.N.Y. 2008)).

Conduct (TRDPC).[82]  NWG argues that Mattick consistently favored the interests of the Blue Water Entities over the interests of NWG, and specifically the interests of Steven and Shawn Pomrenke.

As noted by NWG, Texas law does allow for the forfeiture of all compensation where an attorney commits a clear and serious violation of the ethical duties owed to her client.[83]  The Texas Supreme Court has explained that in such situations, the attorney "has not provided the loyalty bargained for and promised."[84]  Moreover, "the possibility of forfeiture of compensation discourages an [attorney] from taking personal advantage of his position of trust in every situation no matter the circumstances, whether the principal may be injured or not."[85]  Forfeiture of fees,

---

[82] At least one court has noted that a conflict of interest argument "is not a basis for objecting to the allowance of the attorney's claim under section 502(b)(4)." *In re Gutierrez*, 309 B.R. 488, 496 (Bankr. W.D. Tex. 2004).  Section 502(b)(4) is the sole statutory basis raised by NWG for disallowance or reduction of Mattick's claim.  NWG argues that because "[e]thical violations are relevant to a fee determination under section 330," such violations "should be relevant to allowance of a claim for fees."  ECF No. 206, p. 8.  In support of this argument, NWG cites two cases addressing § 330 and a Ninth Circuit appeal of fee disallowance in a class action case.  *Id.* at pp. 8-9.  Although these cases cited by NWG are not directly on point, the United States Bankruptcy Court for the Eastern District of California held that bankruptcy courts should look to state rules of professional conduct in evaluating objections to claims under § 502(b)(4).  *See Siller*, 427 B.R. at 880 ("[A] claim for prepetition attorney's fees for counsel for a debtor is, if state law also requires reasonableness in its own attorney's fee structure, subject to two tiers of reasonableness scrutiny. First, if the claim does not surmount whatever reasonableness standard state law imposes, then it will be disallowed under § 502(b)(1) as being 'unenforceable' as not being 'reasonable' under 'applicable law.'"). Perhaps unusually pertinent in this instance given the applicability of Texas laws to this dispute, the United States Bankruptcy Court for the Western District of Texas has agreed.  *See In re Boulder Crossroads*, 2010 WL 4924745, at *13 (Bankr. W.D. Tex. Dec. 1, 2010) ("The reasonable value should be analyzed under both the state's rules of professional conduct (if applicable) and a federal reasonableness scrutiny.").  These rulings, combined with the Ninth Circuit's holding in *CWS Enterprises* requiring an evaluation of a claim under state law prior to a determination using the lodestar method, have persuaded this court that evaluating NWG's claims regarding Mattick's compliance with her ethical duties under the TDRPC is appropriate under § 502(b)(4).

[83] *Burrow v. Arce*, 887 S.W.2d 229, 237 (Tex. 1999).

[84] *Id.* at 237-38.

[85] *Id.*

17

however, is not automatic.  Rather, courts have discretion to fashion the appropriate remedy in light of the "relevant considerations includ[ing] the gravity and timing of the violation, its wilfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies."[86]

      a.    <u>Texas Disciplinary Rule of Professional Conduct 1.06</u>

The court's analysis necessarily begins with a review of Mattick's representation of the Blue Water Entities and Pomrenke Mining in light of her professional responsibility as prescribed by the TDRPC.  TDRPC 1.06 sets forth an attorney's fundamental duty of loyalty. The Comments to TDRPC 1.06 illustrate the underlying purposes of the rule and are extensive.  Rule 1.06 provides as follows:

> (a)    A lawyer shall not represent opposing parties to the same litigation.
>
> (b)    In other situations and except to the extent permitted by paragraph (c), a lawyer shall not represent a person if the representation of that person:
>
> > (1)    involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm; or
> >
> > (2)    reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interests.
>
> (c)    A lawyer may represent a client in the circumstances described in (b) if:

---

[86] *Id*. at 241 (quoting Restatement (Third) of the Law Governing Lawyers § 49 (Proposed Final Draft No. 1, 1996)).

(1)     the lawyer reasonably believes the representation of
each client will not be materially affected; and

(2)     each affected or potentially affected client consents
to such representation after full disclosure of the
existence, nature, implications, and possible adverse
consequences of the common representation and the
advantages involved, if any.[87]

i.     Application of Rule 1.06(a)

NWG contends that Mattick's representation of the Blue Water Entities precluded her

from ever representing Pomrenke Mining.  Rule 1.06(a) unequivocally precludes joint

representation of opposin paries.  This is most easily understood within the construct of litigation;

one attorney cannot represent both sides.  But that is not the situation involving Mattick's

representation.  Her clients were Pomrenke Mining and the Blue Water Entities.  They were not

adverse.  Rather, NWG maintains that it was adverse to the Blue Water Entities, throughout

Mattick's representation of *Pomrenke Mining*.  Certainly NWG was adverse to the Blue Water

Entities during the negotiations to create Pomrenke Mining.  Mattick did not represent, and could

not have represented, Pomrenke Mining at that time as it did not exist.  Moreover, she has *never*

represented NWG, or its members individually.

Mattick began to represent Pomrenke Mining after she assisted the Blue Water Entities to

create Pomrenke Mining.  For the most part, Mattick understood that her representation of the

Blue Water Entities was ending with the creation of Pomrenke Mining.  With limited exceptions

discussed below, Mattick's representation of the Blue Water Entities did essentially end with the

creation of Pomrenke Mining.  There was nothing inherently adverse to Mattick's representation

---

[87] TX ST RPC 1.06.

of Pomrenke Mining after she represented the Blue Water Entities in the formation of the new company.

NWG points to the intermittent work Mattick performed for the Blue Water Entities but included in her bills to Pomrenke Mining as evidence of her conflict of interest. It argues that Mattick did not differentiate between the Blue Water Entities and Pomrenke Mining as evidenced by her billings. This is certainly one possible interpretation. But again, there was no adversarial relationship between the two entities for the vast majority of Mattick's representation. It was certainly improper to bill services for the Blue Water Entities to Pomrenke Mining, and that time cannot be included within her Claim against the estate.[88] Yet, it appears that Mattick did so as an error rather than as part of any conflict of interest. Indeed, when she began to represent the Blue Water Entities again in earnest starting in June 2018, she billed that time separately to the Blue Water Entities. The time at issue for the improper billings to the Blue Water Entities was also sporadic and largely de minimis. The court concludes that it was erroneously billed and does not constitute evidence of a conflict of interest.

For these reasons, NWG has failed to establish that Mattick's representation of the Blue Water Entities and Pomrenke Mining was adverse so as to bring it within the prohibition contained in Rule 1.06(a).

---

[88] *See, e.g., Charity v. NC Financial Solutions of Utah, LLC (In re Charity)*, 2017 WL 3580173, at **27-28 (Bankr. E.D. Va. Aug. 15, 2017) (reducing, but not wholly disallowing, fees on account of attorneys' failure to separately maintain contemporaneous time records for each of six different adversaries); *see also Denny v. PennyMac Loan Services, LLC*, 252 F.Supp.3d 504, 522 (E.D. Va. 2017) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("It is the obligation of counsel to 'maintain billing time records in a manner that will enable a reviewing court to identify distinct claims.'").

ii.   Application of Rule 1.06(b)

Rule 1.06 does not prohibit all forms of simultaneous representation.  The "[s]imultaneous representation of parties whose interests in litigation are not actually directly adverse but where the potential for conflict exists, such as co-plaintiffs or co-defendants, is governed by paragraph (b)."  Comment 3 notes that "common representation of persons having similar interests is proper if the risk of adverse effect is minimal and the requirements of paragraph (b) are met."[89] Accordingly, an attorney may simultaneously represent clients unless the interests of those clients are, or become, adverse.  As noted in Comment 14 involving non-litigation situations, "a lawyer may not represent multiple parties to a negotiation whose interests are fundamentally antagonistic to each other, but common representation may be permissible where the clients are generally aligned in interest even though there is some difference of interest among them."

As for determining when some difference of interest may become directly adverse, Comment 6 provides the following direction:

> Within the meaning of Rule 1.06(b), the representation of one client is "directly adverse" to the representation of another client if the lawyer's independent judgment on behalf of a client or the lawyer's ability or willingness to consider, recommend or carry out a course of action will be or is reasonably likely to be adversely affected by the lawyer's representation of, or responsibilities to, the other client. The dual representation also is directly adverse if the lawyer reasonably appears to be called upon to espouse adverse positions in the same matter or a related matter.  On the other hand, simultaneous representation in unrelated matters of clients whose interests are only generally adverse, such as competing economic enterprises, does not constitute the representation of directly adverse interests.  Even when neither paragraph (a) nor (b) is applicable, a lawyer should realize that a business rivalry or personal differences between two clients or potential clients may be so important to one

---

[89] TX ST RPC 1.06.

21

or both that one or the other would consider it contrary to its interests to have the same lawyer as its rival even in unrelated matters; and in those situations a wise lawyer would forego the dual representation.[90]

Rule 1.06(c) further conditions representation of dual clients upon the attorney's reasonable belief that the clients will not be materially affected as well as full disclosure and the clients' consent. The Comments to Rule 1.06 also discuss disclosure to clients of an attorney's dual representation. Comment 8 is unequivocal: "Disclosure and consent are not formalities."[91] However, in that same Comment, the drafters note that "[w]hile it is not required that the disclosure and consent be in writing, it would be prudent for the lawyer to provide potential dual clients with at least a written summary of the considerations disclosed."[92] Comment 10 also recognizes that representation that is free of conflict initially can morph into an impermissible dual representation.[93] In such a situation, an attorney may continue representing the clients in question only if "informed consent is obtained from all of the parties to the dispute."[94]

To establish a violation of Rule 1.06(b), NWG was required to show some adversity as between Pomrenke Mining and the Blue Water Entities. NWG's allegations regarding Mattick's purported conflict of interest, however, repeatedly assert that the interests of the Blue Water Entities were adverse to *NWG*.[95] This is not the measure of Mattick's representation. As

---

[90] *Id.*

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] ECF No. 206, pp. 5-7.

previously discussed, Mattick's representation of the Blue Water Entities was generally aligned with the interests of Pomrenke Mining.  NWG has not shown that Mattick's dual representation materially and adversely affected her clients' interests.

This is generally demonstrated in the specific challenges NWG has raised.  It asserts that Mattick's drafting of the Pomrenke Mining formation documents reflects her exclusive loyalty to the Blue Water Entities.  But Mattick drafted those documents while exclusively representing the Blue Water Entities.  In that situation she was adverse to the interests of NWG, which was represented by separate counsel.[96]  Per TDRPC 1.06(b), Mattick's representation of one group of the members does not *automatically* preclude her representation of the subsequently formed company.

NWG also makes much of the Second Engagement Letter having only been signed by Byer, and not copied to NWG.[97]  This ignores the fact that the Board of Managers consented to Mattick's employment via the Unanimous Written Consent dated September 12, 2016.[98]  That Consent was signed by Byer, Shawn Pomrenke and Steve Pomrenke.[99]  It stated that "the Board agrees to hire Ms. Mattick's firm on the terms presented in the [Second Engagement Letter] and authorizes the President and [Chief Operating Officer] to sign the agreement."[100]  The Consent

---

[96] *See, e.g.*, NWG Trial Exh. 3, p. 15 ("Received and reviewed comments on the documents by Shawn Pomrenke and his lawyer....").

[97] ECF No. 206, pp. 5-6.

[98] *See* Mattick Trial Exh. 5.

[99] *Id.* at pp. 2-3.

[100] *Id.* at p. 1.

recites that Second Engagement Letter was attached to it as Exhibit A.[101]   Accordingly, the

Pomrenkes, as equity holders of NWG, authorized Byer, as president and chief operating officer of

Pomrenke Mining, to sign the Second Engagement Letter, after receiving a copy of the Second

Engagement Letter.

NWG further argues that Mattick's billing records generally demonstrate her conflict of

interest.[102]   It argues that Mattick billed for work on matters that favored the Blue Water Entities

and harmed NWG, or the Pomrenkes personally.   NWG points to billing entries for work on a

convertible debt offering, drafting a common security agreement and guaranty of debt for Steven

Pomrenke, a land mining contract also for Steven Pomrenke to sign, and the review of Shawn

Pomrenke's individual contracts with the Discovery Channel as evidence that Mattick was

favoring the Blue Water Entities and "out to get" the Pomrenkes individually.[103]   The court

disagrees.   The testimony at the hearing was clear that the parties were in singular agreement that

additional outside investment would be required to provide capital to the company.[104]   This was

Byer's responsibility, and Mattick followed his instruction.   While NWG views these activities as

adverse to it, they fall within the parameters of her representation of Pomrenke Mining.

---

[101] *See id.* ("Carol Bavousett Mattick, PLLC has presented an engagement letter to [Pomrenke Mining] for work in connection with [Pomrenke Mining's] capital raising activities and general representation with respect to business issues, a copy of which is set forth in Exhibit "A" to this Written Consent."). The Second Engagement Letter is not attached to the Written Consent admitted into evidence as Mattick Trial Exh. 5.

[102] The court has previously addressed NWG's argument that Mattick's billing Pomrenke Mining for work performed for the Blue Water Entities demonstrates an adverse interest which is equally applicable to NWG's arguments under TDRPC 1.06(b).

[103] *See* ECF No. 206, pp. 14-15; ECF No. 223, pp. 7-9; Closing Argument Audio Recording, ECF No. 231 at 21:50-45:35.

[104] Evidentiary Hearing Audio Recording, Mattick Testimony, ECF No. 218 at 2:01:06-2:02:29.

In a similar vein, NWG also charges that Mattick assisted Pomrenke Mining in treating Byer and his daughter, Desoree McDougal, different than the Pomrenkes.[105]  Most directly, NWG complains that Pomrenke Mining paid Byer's daughter, Desoree McDougal, a salary while the Pomrenkes received no compensation for their work.[106]  McDougal, who served as Pomrenke Mining's bookkeeper and contact person, was paid $5,000.00 per month pursuant to the same Written Consent that approved Mattick's Second Engagement Letter.[107]  Again, the Pomrenkes signed the Written Consent on September 14, 2016.  While it is abundantly clear that NWG believes that Byer did not treat them fairly, such treatment largely falls outside of Mattick's representation of Pomrenke Mining.

Importantly, to the extent that Mattick simultaneously represented Pomrenke Mining while still representing the Blue Water Entities, her dual representation did not become significant until June 2018.  Mattick overwhelmingly worked on assisting Pomrenke Mining in soliciting investments as everyone had anticipated.  But in late June 2018, David Young expressed an interest in Pomrenke Mining.[108]  Pomrenke Mining's interest was to solicit Young as an investor.

Mattick testified that Young contacted her directly to discuss the prospect of purchasing the Blue Water Entities.[109]  According to her, Young was interested in Pomrenke Mining only if he

---

[105] ECF No. 206, p. 6; Closing Argument Audio Recording, ECF No. 231 at 39:14-39:49.

[106] Closing Argument Audio Recording, ECF No. 231 at 39:14-39:49.

[107] Mattick Trial Exh. 5.

[108] Evidentiary Hearing Audio Recording, Shawn Pomrenke Testimony, ECF No. 218 at 02:54:08-02:55:47.

[109] *Id.*; *see also* Closing Arguments Audio Recording, ECF No. 231 at 01:15:02-01:15:08.

could obtain majority control of the company.[110]  Mattick then billed the Blue Water Entities for the time pursuing Young's acquisition of the Blue Water Entities.[111]  During closing arguments, Mattick argued that in her professional judgment, permitting Young to purchase the Blue Water Entities was in the best interest of Pomrenke Mining because it would receive an infusion of capital and its members would no longer be in conflict.[112]  The infusion of capital would purportedly flow from a further investment in Pomrenke Mining that Young would make after he successfully acquired the Blue Water Entities.[113]

Additionally, Mattick stated it was her hope that severing Byer from the company would resolve the internal management conflicts that had arisen between Byer and the Pomrenkes by 2018.[114]  She further testified that at the time Young contacted her to discuss the purchase of the Blue Water Entities, Pomrenke Mining had ceased its efforts to raise additional capital.[115] Mattick also confirmed, however, that she was aware that Pomrenke Mining was in financial difficulty in late 2018, and that those difficulties began to present themselves as early as the fall of 2017.[116]

Nonetheless, after Young appeared in late June 2018, Mattick clearly began representing the Blue Water Entities at the same time she was representing Pomrenke Mining.  Pomrenke

---

[110] Evidentiary Hearing Audio Recording, Mattick Testimony, ECF No. 217 at 02:00:52-02:01:17.

[111] *Id.* at 02:01:31-02:01:52; *see also* NWG Trial Exh. 3, pp. 18-25.

[112] Closing Arguments Audio Recording, ECF No. 231 at 01:15:41-01:16:51.

[113] *Id.* at 1:16:02-1:16:16.

[114] *Id.* at 1:16:46-1:17:16.

[115] Evidentiary Hearing Audio Recording, Mattick Testimony, ECF No. 218 at 1:04:39-1:05:03.

[116] *Id.* at 1:07:07-1:08:29.

Mining had retained Mattick primarily to assist Byer in finding, and acquiring, investments for Pomrenke Mining.  No meaningful investments had been found in two years, and the company had lost money since it began its operations.  But when Young expressed interest in Pomrenke Mining, Mattick assisted Byer in his capacity as the manager of Blue Water Entities rather than Pomrenke Mining.

While Mattick has explained that Young would not have been interested in Pomrenke Mining apart from acquiring the Blue Water Entities's interests, there are several problems with this argument.[117]  First, all we have is Mattick's opinion; David Young was not called as a witness.  Moreover, Mattick's argument is speculation, not evidence.  Nor do we have any specific information regarding the nature of Young's interests.

Second, the court simply does not accept the fundamental premise that there was no investment structure possible to provide Young control of the company.  Mattick helped create a complex ownership structure originally for Pomrenke Mining.  Something should have been possible.

Third, and more to the point, Mattick did not even try.  Mattick's billing records fail to show any time for discussions with, or about, Young and his possible investment in Pomrenke Mining in June or July 2018.  Pomrenke Mining retained Mattick primarily to assist it with finding new investment, and Mattick spent the prior two years unsuccessfully doing so.  But when Young expressed interest in Pomrenke Mining, Mattick and the Blue Water Entities disregarded Pomrenke Mining.  Instead, they sought to negotiate Young's acquisition of only the Blue Water Entities's interests.

---

[117] Closing Arguments Audio Recording, ECF No. 231 at 1:17:15-1:17:28.

The court credits the testimony of Shawn Pomrenke that he was still attempting to find new investors for Pomrenke Mining in the summer of 2018.  It therefore discredits Mattick's statements that her primary client up to that point, Pomrenke Mining, was no longer interested in new investment when Young expressed an interest in Pomrenke Mining.  She had not terminated her representation of Pomrenke Mining, which was focused upon finding new investors.  And without the continuation of Pomrenke Mining, it is unclear how or why any investor would be interested in the Blue Water Entities's interests in that company.  Given the totality of the circumstances as it existed in the summer of 2018, it is hard to view the Blue Water Entities's actions, including Mattick's renewed representation of those entities, as anything other than an attempt to cash out.

It is at the moment when the Blue Water Entities began to search investors for their own interests that their self interest became adverse to the interests of Pomrenke Mining for purposes of Mattick's representation.  Though their interests were aligned while Mattick was assisting Pomrenke Mining in finding investors, that changed when she started to represent the Blue Water Entities in an effort to transfer their interests in Pomrenke Mining.  At that point her independent judgment on behalf of Pomrenke Mining, and her "ability or willingness to consider, recommend or carry out a course of action"[118] was affected by her responsibilities to the Blue Water Entities. Moreover, her belief that Young would not be interested in investing in Pomrenke Mining is indicative that her dual representation "called upon [her] to espouse adverse positions in the same matter or a related matter."[119]  She was called upon to prefer the Blue Water Entities in

---

[118] TX ST RPC 1.06, Comment 6.

[119] *Id.*

28

negotiations with Young rather than engage him in negotiations on behalf of Pomrenke Mining, which was the focus of her representation of Pomrenke Mining.

Mattick's representation of the Blue Water Entities in negotiations with David Young, therefore, became directly adverse to her representation Pomrenke Mining.  As such, she breached her duty of loyalty to Pomrenke Mining by representing the Blue Water Entities in the negotiations with Young.  Under Texas law, the resulting conflict of interest under TDRPC 1.06(b) supports denial of Mattick's fees as of that date.  The court rejects NWG's argument that all fees should be forfeited.  There was no conflict for the majority of Mattick's representation of Pomrenke Mining.  Denial of her fees prior to this time serves no purpose, and actually provides NWG with a windfall as they have purchased the estate's assets, and the payment of that purchase price is effectively dependent upon the amount of allowed claims.

Per TDRPC 1.06(e), "if multiple representation properly accepted becomes improper under this Rule, the lawyer shall promptly withdraw from one or more representations to the extent necessary for any remaining representation not to be in violation of these Rules."  Once Mattick's dual representation of Pomrenke Mining and the Blue Water Entities ran afoul of TDRPC 1.06(b), Mattick was obligated to withdraw from representation of either or both clients.  She did not.  Therefore, the court shall deny Mattick's fees billed to Pomrenke Mining after July 1, 2018,[120] totaling a disallowance of $19,031.75.[121]

---

[120] The court notes that Mattick did not bill any fees to Pomrenke Mining in June 2018.

[121] $21,843.75 billed to Pomrenke Mining from 7/1/2018 through 3/15/2019, minus Mattick's $2,812.50 reduction for misattributed billings = $19,031.75.

b.      Texas Disciplinary Rule of Professional Conduct 1.07

In its Supplement, NWG contends that "Mattick had a duty to examine the conflict of interest issues under Texas Disciplinary Rules of Professional Conduct 1.06, 1.07, and 1.12."[122] TDRPC 1.07 limits the instances in which a lawyer may act as an intermediary between clients.[123] Although NWG suggested Mattick violated TDRPC 1.07, it did not present any analysis developing this argument.  As such, it appears that the reference to TDRPC 1.07 adds nothing new to NWG's argument under Rule 1.06, and does not provide an independent basis for denial of Mattick's claim.

c.      Texas Disciplinary Rule of Professional Conduct 1.12

As to TDRPC 1.12, NWG argued that "Rule 1.12 *implies* that the lawyer cannot without disclosure and consent represent the organization and simultaneously represent the interests of the majority members."[124]  The actual language of TDRPC 1.12 provides in pertinent part:

(a)     A lawyer employed or retained by an organization represents the entity.
. . .
(e)     In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when it is apparent that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing or when explanation appears reasonably necessary to avoid misunderstanding on their part.[125]

---

[122] ECF No. 206, p. 7.

[123] *See* TX ST RPC 1.07 ("(a) A lawyer shall not act as intermediary between clients unless [certain conditions are met]...(d) Within the meaning of this Rule, a lawyer acts as intermediary if the lawyer represents two or more parties with potentially conflicting interests.").

[124] ECF No. 206, p. 8 [emphasis added].

[125] TX ST RPC Rule 1.12.

Comment 1 expands on Rule 1.12(a), explaining that "[a] lawyer employed or retained to represent an organization represents the organization as distinct from its...members...or other constituents."[126]  Comment 2 clarifies that for purposes of Rule 1.12, the term "constituents" includes an organization's members.[127]

Comments 4 and 5 to Rule 1.12, under the subheading "Clarifying the Lawyer's Role," appear to contain the provisions NWG is referring to:

> 4.  There are times when the organization's interest may be or become adverse to those of one or more of its constituents. In such circumstances the lawyers should advise any constituent, whose interest the lawyer finds adverse to that of the organization of the conflict or potential conflict of interest, that the lawyer cannot represent such constituent, and that such person may wish to obtain independent representation. Care should be taken to assure that the individual understands that, when there is such adversity of interest, the lawyer for the organization cannot provide legal representation for that constituent individual, and that discussions between the lawyer for the organization and the individual may not be privileged insofar as that individual is concerned. Whether such a warning should be given by the lawyer for the organization to any constituent individual may turn on the facts of each case.
>
> 5.  A lawyer representing an organization may, of course, also represent any of its directors, officers, employees, members, shareholders, or other constituents, subject to the provisions of Rule 1.06. If the organization's consent to the dual representation is required by Rule 1.06, the consent of the organization should be given by the appropriate official or officials of the organization other than the individual who is to be represented, or by the shareholders.[128]

---

[126] *Id.*

[127] *Id.*

[128] *Id.*

Supposing the interests of the Blue Water Entities and Pomrenke Mining were adverse, Byer, by signing both the First and Second Engagement Letters, consented to the dual representation. Even if Byer's signature on the Second Engagement Letter could somehow be considered inadequate consent due to his dual roles as chief operating officer of Pomrenke Mining and as manager of the Blue Water Entities, the board of managers, including the Pomrenkes, consented to Mattick's employment via the Unanimous Written Consent dated September 12, 2016.[129] Importantly, the Second Engagement Letter says, "[m]y firm *has* and will continue to provide corporate and securities legal services to Pomrenke Mining....," implying that Pomrenke Mining's constituents, including NWG, were aware of her dual employment even before the Second Engagement Letter was drafted.[130]

More revealing of NWG's knowledge of Mattick's dual representation are the billing records Mattick has provided detailing her work provided for the Blue Water Entities prior to her employment under the Second Engagement Letter.[131] Those time entries frequently refer to meetings with the Pomrenkes regarding the APA, demonstrating their awareness of Mattick's employment as attorney for the Blue Water Entities.[132]

---

[129] *See* Mattick Trial Exh. 5.

[130] *Id.* at Exh. 4, p. 1 [emphasis added].

[131] *Id.* at Exh. 3.

[132] *Id.* at pp. 1; 3; 10; 12-13; and 15. At the evidentiary hearing, Shawn Pomrenke testified that the first time he was introduced to Mattick, he was informed by Mattick and Byer that Mattick represented Pomrenke Mining, Shawn Pomrenke and Steven Pomrenke. Evidentiary Hearing Audio Recording, Shawn Pomrenke Testimony, ECF No. 218 at 3:00:39-3:01:49. This statement, however, is inconsistent with Mr. Pomrenke's retention of separate counsel; if he thought Mattick was representing him, the retention of separate counsel would be unnecessary. *See, e.g.,* NWG Trial Exh. 3, p. 15 (on 6/1/16: "Received and reviewed comments on the documents by Shawn Pomrenke and his lawyer..."). The weight of Mr. Pomrenke's testimony is accordingly insufficient to persuade the court that NWG or its constituents believed

In short, NWG fails to sufficiently rebut the evidence presented which shows that notwithstanding the lack of express written notification, which is not required under the TDRPC, NWG and its managers were informed of Mattick's concurrent representation of the Blue Water Entities and Pomrenke Mining.  Given the extensive dealings between NWG and the Blue Water Entities as evidenced by Mattick's billing entries, the court rejects any argument that NWG was ignorant of her concurrent representation.

    2.   <u>Interest Rate</u>

Mattick has assessed interest against the unpaid balance for her attorney fees at 18% compounded monthly.[133]  She calculated accrued interest owed on her attorney fees to be $66,296.00 as of the petition date.[134]  NWG challenges the interest charged by Mattick as unreasonable and unconscionable.[135]  It contends that the rate of interest violates TDRPC 1.04, which provides in pertinent part, "[a] lawyer shall not enter into an arrangement for, charge, or collect an illegal fee or unconscionable fee."[136]  Further, NWG suggests that the 18% rate of interest may be barred by Texas Finance Code § 302.001(b), which provides that "[t]he maximum rate or amount of interest is 10 percent a year except as otherwise provided by law. A greater rate of interest than 10 percent a year is usurious unless otherwise provided by law."[137]

_____

Mattick represented them.

    [133] *See* ECF No. 227.

    [134] NWG Trial Exh. 1, p. 53.  Mattick has provided revisions to that figure in her calculations attached to ECF No. 227.

    [135] ECF No. 206, p. 12.

    [136] TX ST RPC Rule 1.04(a).

    [137] Tex. Fin. Code Ann. § 302.001 (West 2019).

Mattick counters by directing the court to Texas Finance Code § 303.001 as the basis for avoiding the 10% cap imposed under Texas Finance Code § 302.001. Under § 303.001 parties to various contracts, including those for an open-end account, may contract for an interest rate greater than ten percent.[138] She contends that her agreement with Pomrenke Mining can be construed as an "open end account."[139] As such, she argues that the applicable ceiling for interest charged is 18% under Texas Finance Code § 303.008.[140]

Neither party makes any serious effort at analyzing the application of the Texas Finance Code to unpaid legal bills for determining the maximum applicable interest rate. The court has not found any authority dispositively addressing the issue. Absent a convincing argument to the contrary, the court cannot conclude that the Texas Finance Code precludes an attorney from charging 18% interest on unpaid bills for legal services. The argument that Texas Finance Code § 302.001 *may* preclude an attorney from charging interest in excess of 10% is insufficient to disallow that interest rate.

NWG similarly states that 18% interest is unconscionable and must be reduced to 10%. As Mattick has established a contractual right to charge 18% interest on unpaid billings, NWG's claims that the contractual interest rate is unconscionable are in the nature of an affirmative defense and it bears the burden of proving unconscionability.[141] Again, NWG provides no

---

[138] *Id.* at § 303.001.

[139] ECF No. 209, p. 4.

[140] *See* Mattick Trial Exhs. 8-9.

[141] *Royston, Rayzor, Vickery, & Williams v. Lopez*, 467 S.W.3d 494, 500 (Tex. 2015)("As our previous opinions have made clear, however, parties asserting defenses to arbitration clauses have the burden to prove the defenses—including unconscionability ...."); *see also In re First Phoenix-Weston, LLC*, 575 B.R. 828, 843 (Bankr. W.D. Wis. 2017) (under Wisconsin law, "[t]he party claiming a contract is unconscionable

reasoning in support of this objection.  Admittedly, 18% interest is high.  However, the parties have provided the court with little guidance as to the determination of unconscionability.  Mattick did provide the court with Texas Ethics Opinion 409 (Opinion 409), admitted as Mattick Trial Exhibit 21.  Opinion 409 approved "the charging of reasonable interest wherein the charge is reasonable and complies with custom and law, and wherein the original fee is set properly and is reasonable."[142]  Still, Opinion 409 also stated: "[I]t will not be considered here whether or not ten percent interest is appropriate or proper.  Any interest charged would have to be considered reasonable and certainly would have to be within legal limits."[143]

Because the issue here is what amount of interest is appropriate, and not whether interest may be charged, Opinion 409 is not particularly helpful.  The record does not include any evidence of what "is reasonable and complies with custom and law."  Nor is there any evidence demonstrating that the rate is unconscionable such that the court may ignore the interest rate agreed upon by the parties under applicable state law.  In short, NWG has not met its burden to prove that the 18% is unconscionable under Texas law.

NWG further argues that Mattick waived her right to charge interest on her fees because she did not add the calculation of interest to her invoices.[144]  Waiver is an affirmative defense,[145]

---

has the burden to prove facts sufficient to support that contention."); *In re Greenfield Dry Cleaning & Laundry, Inc.*, 249 B.R. 634, 642 (Bankr. E.D. Pa. 2000)(Under Pennsylvania law, "[t]he party challenging a contract provision as unconscionable generally bears the burden of proving unconscionability.").

[142] *Id.* at Exh. 21, p. 1.

[143] *Id.*

[144] ECF No. 139, p. 1.

[145] *See Nautilus Ins. Co. v. Iliamna Dev. Corp.*, 2012 WL 13029476, at *11 (D. Alaska Nov. 19, 2012).

and generally requires the intentional and knowing release of a right.[146]  NWG conceded, however, that it did not locate any case law requiring that accrued interest be included in a law firm's bills.[147]  Nor does NWG argue that any part of the claim was stale and precluded by the applicable statute of limitations.  Moreover, as Mattick has pointed out, the Second Engagement Letter clearly states that interest is to be charged on balances unpaid after 30 days.[148]  The court finds that Mattick did not waive her claim for interest on her unpaid fees.

This is not, however, the end of the court's examination of the interest rate issue.  Section 502(b)(4) imposes an additional layer of examination upon claims for attorney fees to ensure that they are reasonable under federal law.  In this instance, with the exception noted above resulting from the conflict of interest arising from Mattick's dual representation concerning David Young's potential investment, the court finds the amount of the billed fees to be reasonable.  But the accrued interest is a material part of Mattick's claim.  This is because she is applying an  interest rate of 18% and compounding that interest monthly.  As a result, she is seeking $66,296.00 in interest on $158,562.50 in outstanding attorney fees.[149]

Unlike NWG's burden to prove unconscionability under Texas law, Mattick bears the burden of proving the reasonableness of her fees under § 502(b)(4).[150]  She argues that 18%

---

[146] *See Resource Funding, Inc. v. Pacific Continental Bank (In re Washington Coast I, L.L.C.)*, 485 B.R. 393, 407 n.12 (B.A.P. 9th Cir. 2012) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)) ("Waiver ordinarily means 'an intentional relinquishment or abandonment of a known right or privilege.'").

[147] Closing Arguments Audio Recording, ECF No. 231 at 50:59-53:20.

[148] NWG Trial Exh. 4, p. 1 ("Any invoice remaining unpaid for more than 30 days from the date of invoice will bear interest at a rate of eighteen percent (18%) per annum.").

[149] *See* Calculation of Interest on Claim, Claim No. 6-1, p. 45.

[150] *Placide*, 459 B.R. at 72.

interest is reasonable because Opinion 409 allowed a ten percent interest 35 years ago.  She

further reasons that 18% interest is appropriate because oversecured creditors may charge default

interest in surplus bankruptcy cases.  These arguments are not persuasive.  Interest serves to

compensate a creditor for the time value of monies owed and the risk of default.[151]  The rate of

interest is typically tied to market and economic forces as well as risk.  Interest rates do not

inexorably increase with the passage of time.  Thus, the passage of time since the issuance of

Opinion 409 does not make Mattick's 18% interest rate reasonable.

Her argument regarding default interest for oversecured creditors is similarly

unconvincing.[152]  First, she is not an oversecured creditor and she is not seeking default interest.

Second, Mattick ignores the specific statutory limitation imposed under § 502(b)(4) for claims

made by attorneys and insiders of the debtor.  Even if Mattick was an oversecured creditor in this

instance, the court would still be required to examine the *reasonableness* of her claim including

the interest charged.  And she is charging 18% compounded monthly on billing statements that

*never* reflected the assessment of interest for past due fees and costs.  She has failed to present *any*

evidence as to why 18% percent is a reasonable interest rate given her representation.

---

[151] *See Till v. SCS Credit Corp.*, 541 U.S. 465, 477 (2004).

[152] *See* ECF No. 209, pp. 18-19.

Courts may generally take judicial notice of prevailing interest rates.[153]  The prime interest rate was 3.5% per annum at the time Mattick entered into the Second Engagement Letter with Pomrenke Mining in September 2016.[154]  The prime interest rate is the applicable rate applied by commercial banks to their most creditworthy borrowers.[155]  The court accepts that Pomrenke Mining was not in that range.  But again, there was no testimony regarding the parties' consideration of risk at the time Pomrenke Mining retained Mattick.  Even with a healthy adjustment for risk, there is no basis in the record to suggest that 18% was appropriate or reasonable at the commencement of Mattick's representation.[156]

Similarly, the Second Engagement Letter did not provide for compounding interest.  Quite to the contrary it stated: "Any invoice remaining unpaid for more than 30 days from the date of the invoice will bear interest at a rate of eighteen percent (18%) per annum."[157] The reference to

---

[153] Fed. R. Evid. 201; *In re Perkins,* 563 B.R. 229, 237 (Bankr. W.D. Ky. 2016), aff'd, 581 B.R. 822 (B.A.P. 6th Cir. 2018)("The Court can take judicial notice of the interest rate by reviewing the rate currently listed in newspapers, such as the Wall Street Journal. The figure is not subject to debate and one that is amendable to judicial notice."); *In re Holliday,* 2012 WL 1579241, at *1 (Bankr. D. Mont. May 4, 2012)(court took judicial notice of prime interest rate); *In re Snider Farms, Inc.,* 83 B.R. 1003, 1005 (Bankr. N.D. Ind. 1988)(court took judicial notice of Federal Reserve Statistical Release H. 15 and associated governmental interest rates for 30 year U.S. treasury bonds).

[154] *See* H. 15 Selected Interest Rates, www.federalreserve.gov (last visited July 31, 2020).

[155] *Till v. SCS Credit Corp.,* 541 U.S. 465, 488 n. 2 (2004)(Thomas, concurring)("The prime rate is "[t]he interest rate most closely approximating the riskless or pure rate for money.")(citing  G. Munn, F. Garcia, & C. Woelfel, Encyclopedia of Banking & Finance 830 (rev. 9th ed.1991)).

[156] *See generally Till*, 541 U.S. at 477- 481 (discussing approaches to selection of applicable interest rates).

[157] Claim No. 6-1, p. 4.

interest accruing "per annum" establishes a right to simple interest on the unpaid balance, not a right to compound interest.[158]

In conclusion, the court finds that 18% is a significantly high interest rate to charge, and Mattick has failed to establish that it was reasonable.  Similarly, the Second Engagement Letter fails to provide for compound interest.  The court, therefore, will reduce the interest rate to 10% simple interest taking into account the allowed interest rate under Texas Finance Code § 302.001, the fact that Pomrenke Mining was a new company, and that all parties acknowledged the company's need for additional investment.  Mattick will be required to recalculate her claim accordingly and file a statement of that calculation which shall be incorporated into the court's final order allowing her Claim in a reduced amount consistent with this decision.

  3. <u>Hourly Rate</u>

Mattick admitted that her hourly rate increased from $350.00 per hour to $375.00 per hour before she submitted any billing statement.  She did not provide written notice of the fee change but testified that she obtained the oral consent of Byer to the rate change.[159]  NWG contends that any rate change without written notification should not be allowed.  It requests that Mattick's fees should be allowed at the rate of $350.00 per hour in accordance with the express statement in the Second Engagement Letter.[160]

---

[158] *See Fitz Fresh, Inc. v. Mondragon*, 2008 WL 4811457, at *2 (N.D. Cal. Nov. 5, 2008) (citing Restatement 2d Contracts § 354) ("[T]he interest charged is simple interest absent an explicit agreement by the parties to use compound interest.").

[159] Evidentiary Hearing Audio Recording, Mattick Testimony, ECF No. 217 at 1:25:00-1:27:10.

[160] ECF No. 206, pp. 12-13.

Notably, the Second Engagement Letter does not contain a provision requiring that any modifications to its terms be in writing.[161]  Mattick introduced evidence that Pomrenke Mining was verbally informed of the rate increase and consented to that increase.[162]  That evidence is uncontroverted.  Nor has the court been presented with any authority prohibiting an attorney from increasing his or her billing rate with the verbal consent of his or her client.  Accordingly, while not recommended that attorneys increase their billing rate without written notification to their clients, on the record presented it cannot conclude that Mattick's billing rate increase should be disallowed in calculating her Claim.

4.    Misattributed Billing Entries

Multiple time entries included in the billing records for Pomrenke Mining were actually attributable solely to the Blue Water Entities.[163]  The court finds this unsurprising in light of Mattick's use of the same billing file number for all three clients.  Significantly, Mattick has not challenged this assertion by NWG.  She has not only amended the Claim to account for the misattributed entries,[164] but has also submitted modified fee calculations[165] to the court to account for additional time entries identified in the NWG Second Supplement.[166]

---

[161] *See* NWG Trial Exh. 4.

[162] Evidentiary Hearing Audio Recording, Mattick Testimony, ECF No. 217 at 1:25:00-1:27:10.

[163] *See, e.g.,* ECF Nos. 172, 223, 225, 227.

[164] ECF No. 172.

[165] ECF No. 227.

[166] ECF No. 223.

40

NWG again goes a step further, requesting disallowance of *all* fees based upon Mattick's misattribution of time entries, suggesting that the misattribution is part of a scheme. Even those time entries identified in the NWG Second Supplement totaled only 18 hours.[167] The court cannot reconcile the identification of 18 hours by NWG with its request that over 400 hours be disallowed. The request is not supported by the evidence.

Mattick has supplied the court with a further reconciliation of the time entries identified by NWG based on her own recollection of the time spent on each task described within those entries.[168] The court concurs with Mattick's assessment that the entirety of the time entries targeted by NWG need not be disallowed. Rather, only the time attributable to tasks for clients other than Pomrenke Mining must be disallowed. For this reason the court accepts Mattick's accounting of the time identified by NWG and will disallow those amounts accordingly.

5.   Federal Reasonableness Standard

At the closing arguments, the parties agreed that there was no dispute as to whether Mattick's hourly rate of either $350.00 or $375.00 per hour was reasonable for the services performed.[169] This simplifies the court's lodestar calculation under the Ninth Circuit standard considerably.

---

[167] *See* ECF No. 233, Exh. 1.

[168] ECF No. 235, Exh. A. Although NWG also initially objected to Mattick's practice of "block billing," or including more than one task in a single time entry, that objection was withdrawn at the evidentiary hearing. *See* Evidentiary Hearing Audio Recording, ECF No. 218 at 3:13:38-3:14:36.

[169] Closing Arguments Audio Recording, ECF No. 231 at 1:40:30-1:40:40.

**CONCLUSION**

For the reasons stated, the court shall disallow Mattick's fees billed to Pomrenke Mining after July 1, 2018, due to her conflict of interest with the Blue Water Entities. Additionally, the court shall allow simple interest on the unpaid balance of fees at the annual rate of 10% through the petition date. An order shall be entered contemporaneously with this memorandum to this effect consistent with this decision and requiring Mattick to submit a revised calculation of her Claim.

DATED: August 5, 2020

BY THE COURT

 /s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge

Serve:  Debtor
       M. Boutin, Esq.
       C. Bavousett Mattick, 110 Broadway Street, Suite 690, San Antonio, TX 78205
       D. Bundy, Esq.
       S. Sather, Esq.
       C. Christianson, Esq.
       K. Battley, Trustee
       U.S. Trustee
       ECF Participants via NEF
       Case Manager