**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF ALASKA**

In re:

POMRENKE MINING, LLC,

        Debtor.

Case No. 19-00083-GS
Chapter 7

### ORDER ON MISCELLANEOUS MOTIONS REGARDING CALCULATIONS OF CERTAIN CLAIMS AFTER RULINGS ON CLAIMS OBJECTIONS

As a result of the chapter 7 trustee's administration of this estate, Kenneth Battley, the chapter 7 trustee, has filed his Final Report which includes a proposed distribution to pay all allowed claims in full and applicable interest as required by 11 U.S.C. § 726(a)(5). (ECF No. 337). Even after payment of all claims and interest, the trustee projects a surplus that shall be returned to the debtor pursuant to 11 U.S.C. § 726(a)(6). Although the trustee has noticed his Final Report, several questions must be answered before the estate can make its final distribution. The deadline for objections to the Final Report has expired without objection, and the trustee has filed his certificate of no objection. (ECF No. 352).

In its Memorandum Decision on Objection to Proof of Claim No. 6 (ECF No. 302), the court ruled on Northwest Gold Diggers, LLC's (NWG) objections to Carol Bavousett Mattick, PLLC's (Mattick) Proof of Claim No. 6. At the conclusion of its Memorandum, the court required Mattick to refile its claim in light of the ruling. Mattick recalculated its claim at ECF No. 307. NWG objected to Mattick's recalculation. Several responses, replies and sur-replies followed but the parties ultimately agreed to the amount of the restated claim as of the petition date. They continue to dispute, however, the applicable postpetition interest rate to be applied and request that the court rule on that issue.

NWG also filed its Motion to Establish Distribution to Equity Owners Based on Capital Accounts Stated in Last Filed Tax Return (Motion to Establish Distribution).[1] (ECF No. 313). NWG asks that the court rule on the allocation amongst it and the other members of the debtor: Blue Water Gold and Blue Water Mining (the Blue Water Entities). Pursuant to the Order Granting Trustee's Motion for Approval to Sell Assets, Free and Clear of Liens, to NWG/Pomrenke (ECF No. 111) (Sale Order), NWG contends that under § 726(a)(6) the trustee is required to distribute the surplus monies after paying all allowed unsecured claims and interest to the debtor's members rather than returning it to the debtor. NWG proposes that such distribution must be made pursuant to the relevant capital accounts, though the Blue Water Entities argue that the distribution is governed by the debtor's distribution requirements.

The court heard oral argument on the Motion to Establish Distribution on October 28, 2020. At the conclusion of the hearing, the court requested supplemental briefing on the issues raised, and requested that the trustee advise the court of his position regarding distribution to the members as well. The request to determine Mattick's applicable postpetition interest rate was also scheduled for argument at that same time and submitted for decision.

The parties, including the trustee, have provided the supplemental briefing requested by the court. As part of his supplemental briefing, the trustee has filed a request for rulings without further hearings on: (1) Mattick's post-petition interest issue; and (2) the equity distribution issue. Counsel

---

[1] Shortly before oral argument on the Motion to Establish Distribution, NWG filed its sur-reply (ECF No. 330); an affidavit of Shawn Pomrenke supporting its motion (ECF No. 331); an objection to the Mattick spreadsheets (ECF No. 332); and an exhibit list (ECF No. 333/335), together with a separate motion to allow them as late filed (ECF No. 334). The Blue Water Entities objected to that motion. (ECF No. 338). The court has looked at the additional information and argument, and finds that it does not materially assist in the resolution of the Motion to Establish Distribution, and the su-rreply introduces a new request to subordinate the Blue Water Entities' interests under 11 U.S.C. § 510(c). NWG offers no reason why these documents and arguments were not raised previously. Taking this into consideration together with the objection and cumulative nature of the additional evidence presented, the court shall deny the motion.

for the trustee had previously filed his final fee application, believing that no additional legal services were required. (ECF No. 327). Based upon the court's request for supplemental briefing from the trustee, counsel incurred additional fees and sought to shorten time for the court to consider his Supplement to Trustee's Second and Final Application to Pay Fees to Trustee's Attorney (Supplemental Fee Application). (ECF No. 346). The court granted the request to shorten the time, and objections to the Supplemental Fee Application were due on November 19, 2020. (ECF No. 349). The order shortening time also provided that the court would rule on the question of Mattick's postpetition interest and allocation of the members' equity interest without further hearing unless the court deemed additional argument necessary. Upon review of the briefings on these matters the court concludes that further argument is not necessary, and addresses the remaining miscellaneous issues as follows.

      **A.**     **Mattick's unsecured claim is entitled to interest at the stautory rate pursuant to 11 U.S.C. § 726(a)(6).**

Creditors Mattick and NWG have filed a series of papers concerning the calculation of Mattick's prepetition claim, including the principal and interest for such claim in light of the court's Memorandum Decision on Objection to Proof of Claim No. 6 (ECF No. 302). The parties have agreed that Mattick's claim should be allowed in the total amount of $161,172.09, comprised of $159,750.00 in principal for unpaid legal services, plus $25,765.84 in interest accruing at 10% until the petition date of March 15, 2019.

The parties continue to dispute, however, the appropriate postpetition interest rate. Because the bankruptcy estate is solvent and will pay all allowed claims, 11 U.S.C. § 726(a)(5) requires "payment of interest at the legal rate from the date of filing of the petition" for allowed claims. Mattick requests that the court apply its contract interest rate of 10% per annum as the "legal rate" of postpetition interest. However, the Ninth Circuit has held that the federal interest rate set forth

in 28 U.S.C. § 1961(a) is the applicable postpetition rate for purposes of § 726(a)(5). *Onink v. Cadelucci (In re Cardelucci)*, 285 F.3d 1231, 1234 (9th Cir. 2002); *see also Beguelin v. Volcano Vision, Inc. (In re Beguelin)*, 220 B.R. 94, 99 (B.A.P. 9th Cir. 1998). Accordingly, the trustee must pay postpetition interest on all allowed claims, including Mattick's allowed claim of $161,172.09, using the federal interest rate set forth in 28 U.S.C. § 1961(a).

      **B.**    **The trustee may distribute any surplus funds net of payments to unsecured creditors to the members in accordance with their capital contributions.**

The estate will have surplus assets after paying all allowed unsecured claims and interest. Pursuant to § 726(a)(6) the estate is required to return such surplus to "the debtor." As part of the administration of the estate the trustee sold assets to NWG. That sale generated the funds to be distributed by the estate and has left a surplus to be returned to the debtor. The relationship between the debtor's members has been fractious and is largely why the debtor filed for bankruptcy. As part of the sale agreement approved by the court, the parties anticipated that some surplus would exist and provided that after payment of the allowed claims and applicable setoffs,

> then [the estate] will divide the Promissory Note into one or more Subnotes in accordance with court determined division of equity interest percentage due each owner. When this division occurs, then the total balance of all the Subnotes shall equal the balance due on the Promissory Note before such division; each Subnote shall be separately enforceable by the holder of such Subnote; and the Seller shall determine the extent to which the security agreements and mortgages securing the Promissory Note shall secure payment of each Subnote. The Seller shall distribute unsecured Subnotes to the holders of the equity owner claims as determined by the court, and each equity owner shall agree to accept such Subnotes as dollar-for-dollar credits in distribution of equity.

ECF No. 111, p. 17.

Ordinarily, the trustee simply would return the surplus to Pomrenke Mining, LLC at the conclusion of the bankruptcy. Here, however, all parties agree that distribution of the surplus was

incorporated into the sale, which the court approved over the objection of the Blue Water Entities. The court accepts the parties' supplemental briefing on this point. As the Blue Water Entities observed in their supplemental briefing, the few courts that have approved a surplus bankruptcy distribution to equity under § 726(a)(6) have done so pursuant to a stipulation amongst the equity holders. *See GMGRSST, Ltd. v. Menotte (In re Air Safety International, L.C.),* 336 B.R. 843 (S.D. Fla. 2005). There is no stipulation here, but the Sale Order serves a similar function. The court finds it appropriate to allocate the members' interests so that the estate may disburse any surplus as part of its distribution.

NWG and the Blue Water Entities disagree as to the allocation of their interests. NWG argues that the surplus must be allocated according to the applicable capital contributions as stated in the debtor's 2018 federal tax return. The Blue Water Entities respond that the allocation must follow § 8.05 of the First Amended Company Agreement, which requires that 60% of "Available Cash," as that term is defined in the Agreement, is payable to members who have "Preference Targets." Per § 8.05, the remaining 40% of the Available Cash is payable to those members without Preference Targets. (ECF No. 318-3, p. 21).

In his supplemental brief, the trustee examined the language of § 8.05 of the Agreement, and attempted to reconcile that provision with the remainder of the Agreement. He concluded that several provisions within the Agreement were potentially applicable, but were internally inconsistent and confusing to interpret. Ultimately, the trustee concluded that any surplus payments to the debtor's members should be allocated under the provisions related to termination under § 12.01 of the Agreement rather than a distribution of "Available Cash" under § 8.05.

The court agrees with the trustee's analysis. The monies available for the debtor's members resulted from liquidation rather than operations. The Blue Water Entities attempt to blunt the reality

of this situation by noting that the debtor will still exist after the bankruptcy closes. This is true. And that is exactly why § 726(a)(6) provides for the return of any surplus net of claims to "the debtor." This enables the debtor to wind up by disbursing such funds as may be appropriate. Here, however, the members are in agreement that this process should effectively be undertaken now. Accordingly, the distribution of any surplus assets from the bankruptcy estate results from the liquidation and termination of Pomrenke Mining and is governed by § 12.01 of its Agreement.

This conclusion does not resolve the allocation among the members. Section 12.01 specifically references § 8.05, thereby incorporating its "Available Cash" provision. It states: "[A]fter all Capital Account adjustments for the Company's taxable year in which the liquidation occurs (including without limitation adjustments required under Treasury Regulations Section 1.704(b)(2)(iv)(e), relating to distributions in kind), to the Members in accordance with the same order and priority set forth in Section 8.05. **If such distributions do not correspond to the Capital Accounts of the Members immediately prior to distributions, then income gain, loss and deductions for the fiscal year in which the liquidation occurs shall be reallocated among the Members to cause, to the greatest extent possible, the Members' Capital Accounts immediately prior to such distribution to correspond to amounts to be distributed hereunder.**" (ECF No. 342-3, p. 2) (Emphasis added). As noted by the trustee, the clear reference to § 8.05 is immediately modified by a directive to modify the distribution if it would "not correspond to the Capital Accounts of the Members immediately prior to distributions." This is to be done by reallocating the members' capital accounts "to the greatest extent possible" to reflect the capital accounts immediately prior to any distribution.

The parties are in agreement that the Preference Targets that are the subject of allocation within § 8.05 never received any monies. But it is equally clear from the parties' briefing that such

allocation would generate a greater distribution for the Blue Water Entities than one based upon the existing capital accounts. The court, therefore, concludes that applying the language of § 12.01, the allocation for distribution must be reallocated to "correspond to the Capital Accounts of the Members immediately prior to distributions." The parties provide no analysis of how this is to be accomplished within the meaning of § 12.01, other than use of the capital accounts as stated in the debtor's 2018 federal tax return. This would result in a proposed distribution as follows:

| | | | |
|---|---|---|---|
| Northwest Gold Diggers | $ | 1,429,628.00 | 48.50% |
| Blue Water Gold, LLC | $ | 1,416,413.00 | 48.05% |
| Blue Water Mining, LLC | $ | 77,429.00 | 2.63% |
| Roland Werner | $ | 24,498.00 | 0.8200% |
| | $ | 2,947,968.00 | 100.00% |

Both the Blue Water Entities and the trustee point out that NWG's capital account includes amounts for all of NWG's "gold loans" and expense payments. The court has previously found that most of the gold loans and all of the expense payments were actually debt rather than equity contributions. Thus, $233,260.63 of the $288,359.29 booked for the gold loans, and the $116,533.18 for capital expenses included as part of NWG's capital account must be excluded. This reduces NWG's capital account to $1,079,834.00, and results in the following percentages:

| | | | |
|---|---|---|---|
| Northwest Gold Diggers | $ | 1,079,834.00 | 41.56% |
| Blue Water Gold, LLC | $ | 1,416,413.00 | 54.52% |
| Blue Water Mining, LLC | $ | 77,429.00 | 2.98% |
| Roland Werner | $ | 24,498.00 | 0.94% |
| | $ | 2,598,174.00 | 100.00% |

On November 16, 2020, NWG filed a Reply to Trustee's Response to NWG's Motion to Establish Distribution to Equity Owners (ECF No. 351), in which it requests that the court now examine the validity of the Blue Water Entities' capital accounts.[2] NWG explains that it was not

---

[2] Oral argument was conducted and supplemental briefing was completed by November 9, 2020. NWG's response requesting examination of the Blue Water Entities' capital accounts was filed on November 16, 2020. NWG did not seek permission to file another supplemental response. The court considers NWG's

until the trustee's supplemental brief that an analysis of NWG's capital account was introduced as a new element to NWG's motion.  However, it was NWG itself that opened the door to examine its capital account when it sought to increase the capital account by $55,098.66 in light of the court's Order on NWG's Proof of Claim No. 1 (ECF No. 310) and corresponding oral ruling.  NWG presented that argument within its Motion to Establish Distribution.  The Blue Water Entities then addressed the effect of the court's Order in their Opposition to Motion to Establish Distribution to Equity Owners Based on Capital Account Amount Stated in Last Filed Tax Return (ECF No. 318), in which they argued:

> The percentage allocation of capital account balances in the 2018 tax return is as stated on page 2 of the NWG memorandum (ECF #314), but NWG's proposal on page 3 to increase NWG's percentage due to the Court's determination that NWG had contributed capital of $55,098.66 is not accurate. The Court did indeed determine that NWG had made that contribution, but at the same time the Court also determined that most of the "gold loans" as well as the payment on the Tuvli I vessel mortgage were in fact loans, and not capital contributions as was recorded in the 2018 tax return. Therefore, NWG's capital account is not larger than stated in the 2018 return, it is smaller as a result of these adjustments. The net NWG account for distribution purposes (again, assuming that the account balances should be used at all, which the Blue Water Entities dispute) is $1,079,834, or 41.46% of the total.

ECF No. 318 at p. 3.

The calculation of NWG's capital account has been contested since NWG filed its Motion to Establish Distribution.  The adjustment follows the court's specific findings as to

---

response to be a sur-reply filed after briefing was complete.  Generally, courts do not consider sur-replies filed without permission.  *Wagner v. Shydohub (In re Vaughan Co.)*, 2014 WL 1347481, at *1 (Bankr. D.N.M. Apr. 4, 2014); *see generally Saensinbandit v. Alaska Airlines, Inc.*, 2019 WL 6841972, at *1 (D. Alaska Dec. 15, 2019)(noting that sur-reply was filed with court's permission); AK LBR 9013-1 (providing for filing of reply but not addressing of filing subsequent papers by parties).  This court has generally accepted sur-replies, but it does so in its discretion.  For the reasons stated above, however, the court declines to consider NWG's response at ECF No. 351.

NWG's Proof of Claim No. 1, and whether the amounts asserted within the claim were debt or capital contributions to equity. In stark contrast, the calculation of the Blue Water Entities' capital accounts was never at issue in the determination of *NWG's* proof of claim. That matter has never been litigated. Indeed, it was never raised until NWG's November 16, 2020 memorandum. While the parties may have referenced the Blue Water Entities' capital accounts within NWG's claim litigation, they were not examined in any detail and were not at issue. NWG cannot raise a new challenge for the first time by filing an unauthorized sur-reply after oral argument and completion of the supplemental briefings. It is simply too late and too far removed from its original motion. *See generally Zamani v. Carnes,* 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.")

For these reasons, the court finds that the capital accounts as stated in the debtor's 2018 federal tax return, adjusted to account for the court's prior ruling on NWG's Proof of Claim No. 1, must be applied to any distribution to equity under § 726(a)(6) under the First Amended Company Agreement.

### C. The supplemental fee application of the trustee's counsel is approved.

As noted above, the trustee's counsel has filed his Supplemental Fee Application seeking $8,876.00 in legal fees in addition to the $21,296.00 in fees and $468.81 in costs sought in his Amended Trustee's Second and Final Application to Pay Fees and Costs to Trustee's Attorney (Amended Second Fee Application) (ECF No. 328). Objections to the fees were due by November 19, 2020. (ECF No. 349). No objections were received. The court has reviewed the fees and costs sought in the Amended Second Fee Application and Supplemental Fee Application, and find the fees and expenses to be reasonable. The court shall approve payment

of outstanding fees from these two applications in the total amount of $30,072.00 and costs of $468.81.

### D. The trustee must file a supplement to the Final Report.

No party in interest has objected to the trustee's Final Report. The trustee has filed a proposed order approving the final account using the fees and costs for his counsel as stated in the Amended Second Fee Application, but excludes the additional fees incurred in the supplemental briefing and detailed in the Supplemental Fee Application. The trustee's Final Report states that the estate held $16,088.30 after payment to fund interest payments to creditors under § 726(a)(4). (ECF No. 337 at 5). The Final Report further states that after payment of interest, the estate would have $266.88 in surplus funds to return to the debtor. (*Id.*) However, the additional $8,876.00 in supplemental legal fees approved to pay trustee's counsel's Supplemental Fee Application leaves the estate with insufficient funds to fully pay all interest due creditors.

But not all monies owed under the Sale Order have been paid, as all parties have anticipated a solvent estate and a return of surplus to the members of the debtor in the form of subnotes. Per the trustee's Report of Sale dated October 2, 2020, the balance remaining from the sale exceeds $100,000. (ECF No. 324). Accordingly, an additional payment will be required to fund the full payment of interest to creditors.

That additional payment to the estate will not adversely affect any creditor, but reduces the surplus to be divided among the members of the debtor. Accordingly, no additional notice shall be required. The court will, however, require the trustee to file a supplement to the Final Report to disclose the additional funds received by the estate to pay interest on all allowed claims. The supplement to the Final Report should also revise the current balance under the note

as previously stated in the Report of Sale and state the distributions for the subnotes to be made to the members in accordance with the terms of this order. Together with this supplemental information, the trustee may lodge a revised Order on Trustee Final Report Before Distribution, which the court may enter without further notice or hearing.

Therefore,

IT IS HEREBY ORDERED that Proof of Claim No. 6 filed by Carol Bavousett Mattick, PLLC, is allowed in the amount of $161,172.09 for principal and prepetition interest, and shall accrue postpetition interest under the Federal interest rate set forth in 28 U.S.C. § 1961(a).

IT IS FURTHER ORDERED that Northwest Gold Diggers, LLC's Motion to Allow Late-filed Documents Regarding Motion to Establish Distribution to Equity Owners Based on Capital Account Amounts Stated in Last Filed Tax Return (ECF No. 334) is DENIED, and the court strikes the affidavit of Shawn Pomrenke (ECF No. 331), the objection to the Mattick spreadsheets (ECF No. 332); NWG's exhibit list (ECF No. 333/335), and the sur-reply filed at ECF No. 330. The related motion to allow those pleadings as late-filed (ECF No. 334) is also DENIED.

IT IS FURTHER ORDERED that distribution to members of the debtor pursuant 11 U.S.C. § 726(a)(6) shall be in accordance with the revised capital account for Northwest Gold Diggers, LLC in the amount of $1,079,834.00, and the resulting percentages:

| | | |
|---|---:|---:|
| Northwest Gold Diggers | $ 1,079,834.00 | 41.56% |
| Blue Water Gold, LLC | $ 1,416,413.00 | 54.52% |
| Blue Water Mining, LLC | $ 77,429.00 | 2.98% |
| Roland Werner | $ 24,498.00 | 0.94% |
| | $ 2,598,174.00 | 100.00% |

IT IS FURTHER ORDERED that the Law Offices of Cabot Christianson's Amended Trustee's Second and Final Application to Pay Fees and Costs to Trustee's Attorney (Amended

Second Fee Application) (ECF No. 328) in the amounts of $21,296.00 in fees and $468.81 in costs, as well as the Supplemental Fee Application seeking $8,876.00 in fees are GRANTED.

IT IS FINALLY ORDERED that the trustee shall file a supplement to his Final Report to disclose the additional funds received by the estate from the sale of assets approved by the Order Granting Trustee's Motion for Approval to Sell Assets, Free and Clear of Liens, to NWG/Pomrenke (ECF No. 111) necessary to pay postpetition interest on all allowed claims pursuant to 11 U.S.C. § 726(a)(6). The supplement shall also provide the revised current balance under the buyer's note and state the distributions for the subnotes to be made to the debtor's members in accordance with the terms of this order. Upon filing this supplemental information, the trustee may lodge a revised Order on Trustee Final Report Before Distribution, which the court may enter without further notice or hearing.

DATED: November 25, 2020

BY THE COURT

/s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge

Serve:  M. Boutin, Esq.
D. Bundy, Esq.
M. Mills, Esq.
C. Christianson, Esq.
K. Battley, Trustee
U.S. Trustee
ECF Participants via NEF
Case Manager